FRANK PALADINO, Individually and as Father and Natural Guardian of MICHAEL PALADINO, an Infant, et al., Respondents, v ADELPHI UNIVERSITY, Defendant, and WALDORF SCHOOL, Appellant.

Second Department, October 12, 1982

APPEARANCES OF COUNSEL

*Deegan & Reardon* (*Robert J. Aurigema* and *Marian C. Rice* of counsel), for appellant.

*Lawrence B. Kahn* for respondents.

### OPINION OF THE COURT

BROWN, J.

At issue is whether recovery may be had against a private elementary school for breach of contract based upon its alleged failure to provide a quality education to a student enrolled in the school. We hold that such action does not lie. Further, we conclude that, under the facts here present, related claims predicated upon fraudulent misrepresentation and deceit must similarly be dismissed.

Michael Paladino was enrolled at the nursery grade level at the Waldorf School in 1972 and continued at the school through the fifth grade. His teachers during this period sent evaluation reports to Michael's parents that assessed his performance in each area of his curriculum. In 1979, while he was attending fifth grade, Michael evidenced certain learning problems and his parents sent him to a private testing institution for independent evaluation. The results showed that Michael was not equipped with sufficient skills for fifth grade and was several grades below fifth grade level in arithmetic, reading and writing. Thereafter, the school refused to promote Michael to the sixth grade and his parents enrolled him in public school where he repeated the fifth grade.

Michael's father alleged in his complaint that the Waldorf School breached its agreement by failing to provide quality education, qualified and expert teachers, necessary tutorial and supportive skills, accurate and factual progress reports; and that it furnished false and misleading progress reports which reflected that Michael was making satisfactory progress in his studies and promoted him each year to the next grade. A second cause of action was asserted on behalf of Michael as a third-party beneficiary of the agreement with the school and the father pleaded a third cause of action sounding in deceit based on the allegedly inaccurate progress reports and misrepresentations concerning the quality of the education. A fourth

cause of action for deceit was also pleaded on behalf of Michael.

Special Term denied the school's motion for summary judgment holding that the established policy of our courts in refusing to entertain lawsuits for educational malpractice did not bar an action in contract nor one based upon fraudulent misrepresentation (110 Misc 2d 314). Our review of the case law and the record herein compels a contrary conclusion.

The courts have uniformly refused, based on public policy considerations, to enter the classroom to determine claims based upon educational malpractice (see *Hoffman v Board of Educ.*, 49 NY2d 121; *Donohue v Copiague Union Free School Dist.*, 47 NY2d 440; *Loughran v Flanders*, 470 F Supp 110, 115; *D.S.W. v Fairbanks North Star Borough School Dist.*, 628 P2d 554, 556 [Alaska]; *Hunter v Board of Educ.*, 292 Md 481, __, 439 A2d 582, 585-586; *Peter W. v San Francisco Unified School Dist.*, 60 Cal App 3d 814, 824-825; *Helm v Professional Children's School*, 103 Misc 2d 1053).

In the context of a negligence action, the court in *Loughran v Flanders* (*supra,* p 115) stated that a "claim for damages necessarily hinges upon questions of methodology and educational priorities, issues not appropriate for resolution by this Court". In *Hunter v Board of Educ.* (*supra,* p 585) the court said that "to allow petitioners' asserted negligence claims to proceed would in effect position the courts of this State as overseers of both the day-to-day operation of our educational process as well as the formulation of its governing policies. This responsibility we are loathe to impose on our courts."

In *Donohue v Copiague Union Free School Dist.* (*supra*) the Court of Appeals first considered the issue of educational malpractice. There, the plaintiff had claimed that his educational deficiency resulted from the institution's failure to perform its duties and obligations to educate him. Similar to the claimed offending acts in the case at bar, the plaintiff in *Donohue* specifically alleged in his complaint that the school (p 442): " 'gave to [appellant] passing grades and/or minimal or failing grades in various

subjects; failed to evaluate [appellant's] mental ability and capacity to comprehend the subjects being taught to him at said school; failed to take proper means and precautions that they reasonably should have taken under the circumstances; failed to interview, discuss, evaluate and/or psychologically test [appellant] in order to ascertain his ability to comprehend and understand such matter; failed to provide adequate school facilities, teachers, administrators, psychologists, and other personnel trained to take the necessary steps in testing and evaluation processes insofar as [appellant] is concerned in order to ascertain the learning capacity, intelligence and intellectual absorption on the part of [appellant]'." While concluding that the traditional tort elements were capable of proof, the court said (p 443) that showing proximate causation "might indeed be difficult, if not impossible". It then stated that (p 444) "[t]he heart of the matter is whether, assuming that such a cause of action may be stated, the courts should, as a matter of public policy, entertain such claims. We believe they should not." It reasoned that (p 445) "[r]ecognition in the courts of this cause of action would constitute blatant interference with the responsibility for the administration of the public school system lodged by Constitution and statute in school administrative agencies".

In *Hoffman v Board of Educ.* (49 NY2d 121, 125-126, *supra*), the Court of Appeals again was asked to consider the issue and responded by stating that it "had thought it well settled that the courts of this State may not substitute their judgment, or the judgment of a jury, for the professional judgment of educators and government officials actually engaged in the complex and often delicate process of educating the many thousands of children in our schools". The *Hoffman* case involved the wrongful placement of a student in a class for mentally retarded children where he remained for over 12 years even though it was recommended that he be retested within two years of his initial placement. In commenting upon the position in which the courts would be placed should they be deemed an appropriate forum to resolve claims for educational malpractice, the court said (pp 126-127): "In the present case, the decision of the school officials and educators who classi-

fied plaintiff as retarded and continued his enrollment in CRMD classes was based upon the results of a recognized intelligence test administered by a qualified psychologist and the daily observation of plaintiff's teachers. In order to affirm a finding of liability in these circumstances, this court would be required to allow the finder of fact to substitute its judgment for the professional judgment of the board of education as to the type of psychometric devices to be used and the frequency with which such tests are to be given. Such a decision would also allow a court or a jury to second-guess the determinations of each of plaintiff's teachers. To do so would open the door to an examination of the propriety of each of the procedures used in the education of every student in our school system. Clearly, each and every time a student fails to progress academically, it can be argued that he or she would have done better and received a greater benefit if another educational approach or diagnostic tool had been utilized. Similarly, whenever there was a failure to implement a recommendation made by any person in the school system with respect to the evaluation of a pupil or his or her educational program, it could be said, as here, that liability could be predicated on misfeasance. However, the court system is not the proper forum to test the validity of the educational decision to place a particular student in one of the many educational programs offered by the schools of this State". In our view, the soundness of this policy of noninterference is equally applicable when the action is brought against a private educational institution and is formulated in contract.

In *Hunter v Board of Educ.* (292 Md 481, 439 A2d 582, *supra*) the gravamen of plaintiffs' action sounded in negligence. Breach of contract and intentional misrepresentation were, however, advanced as theories of recovery as well. With respect to the contract claim, the court concluded that (p __, p 586, n 5) "the uncertainty of damages, the difficulty in determining legal cause, and the public policy factors preluding negligence claims remains true whether the allegations state breach of contract or tort".

Where the essence of the complaint is that the school breached its agreement by failing to provide an effective

education, the court is again asked to evaluate the course of instruction. It is similarly called upon to review the soundness of the method of teaching that has been adopted by an educational institution. There is nothing novel about a contract action that would permit for judicial intervention into the process of learning. For in effect, the claim still requires judicial displacement of complex educational determinations made by those charged with the responsibility to instruct the child. As our colleague Justice DAMIANI pointed out in *Donohue v Copiague Union Free School Dist.* (64 AD2d 29, 35, affd 47 NY2d 440, *supra*), "The courts are an inappropriate forum to test the efficacy of educational programs and pedagogical methods".

In the case at bar, the educational institution is private rather than public. It is well established that the Legislature may in the public interest impose certain requirements upon the operation of private institutions (see *Pierce v Society of Sisters*, 268 US 510, 534; *Meyer v Nebraska*, 262 US 390, 402; *Packer Coll. Inst. v University of State of N. Y.*, 298 NY 184). Thus, regulations have been adopted concerning educational quality in private schools (Education Law, § 5003; 8 NYCRR Part 126). Initially, instructions to minors given elsewhere than at a public school "shall be at least substantially equivalent to the instruction given to minors of like age and attainments at the public schools of the city or district where the minor resides" (Education Law, § 3204, subd 2). The schools are licensed by the Department of Education (Education Law, § 5001). The license is subject to renewal every two years (Education Law, § 5003, subd 2). "[T]he standards and the methods of instruction [and] * * * the qualifications of teaching and management personnel * * * shall comply with standards for approval set forth in regulations of the commissioner" (Education Law, § 5003, subd 1; 8 NYCRR 126.4). Teachers and directors must be licensed by the department "pursuant to regulations of the commissioner" (Education Law, § 5003, subd 3; 8 NYCRR 126.6). The commissioner may take disciplinary action against the school for "good cause" (Education Law, § 5003, subd 4; 8 NYCRR 126.14; see *Matter of Pooler v Nyquist*, 89 Misc 2d 705, 708). The regulatory scheme requires that the quality

of education provided by private institutions be closely monitored by the State Education Department. If the school is not meeting its obligations, then the matter is capable of resolution within the educational system.

The courts should not become engaged in determining the propriety of the course of instruction adopted by a private school. Despite the absence of a constitutional or statutory predicate, the reluctance on the part of the judicial branch to interfere with the educational policies adopted for public schools should be equally applicable to private institutions. The educational malpractice cases serve to define the function and role of the judiciary in relation to educational institutions generally. Simply put, the courts should refrain from becoming overseers of the learning process. As was stated in *Hunter v Board of Educ.* (47 Md App 709, 716, mod 292 Md 481, *supra*):

"We are aware that a serious social problem exists when, as here, a student is 'promoted' through the school system, from grade to grade, and yet, he or she has not been taught to read. We are equally cognizant of criticisms of the teaching profession. The situation is even more serious when one recalls to mind the words of Thomas Jefferson, that a nation cannot be ignorant and free, in a state of civilization, at one and the same time.

"The seriousness of a matter, however, does not mean that a solution may be found, or redress obtained, through the use of the court. Courts cannot solve every societal problem. The courts, on constitutional grounds, can decide that all schools must afford equal protections of the laws, but courts may not decide the curriculum, nor the degree of proficiency needed to advance from grade to grade through the school system. The field of education is simply too fraught with unanswered questions for the courts to constitute themselves as a proper forum for resolution of those questions".

Professional educators — not Judges — are charged with the responsibility for determining the method of learning that should be pursued for their students. When the intended results are not obtained, it is the educational community — and not the judiciary — that must resolve the

problem. For, in reality, the soundness of educational methodology is always subject to question and a court ought not in hindsight, substitute its notions as to what would have been a better course of instruction to follow for a particular pupil. These are determinations that are to be made by educators and, though they are capable of error, their integrity ought not be subject to judicial inquiry. In this regard, we cannot perceive how the professional judgment of educators concerning the course of teaching a particular student in a private school, as opposed to a public school, becomes more amenable to attack in the courts. Public policy should similarly prevent a court from interfering with private schools when the controversy requires the examination of the efficacy of the course of instruction.

If in a case such as this, a private school were simply to accept a student's tuition and thereafter provide no educational services, an action for breach of contract might lie. Similarly, if the contract with the school were to provide for certain specified services, such as for example, a designated number of hours of instruction, and the school failed to meet its obligation, then a contract action with appropriate consequential damages might be viable. However, here the essence of the contract cause of action pleaded is that the Waldorf School failed to educate Michael. The asserted breach is predicated upon the quality and adequacy of the course of instruction. The claim requires the fact finder to enter the classroom and determine whether or not the judgments and conduct of professional educators were deficient. The specific allegations in support of the claimed breach are that the school failed to provide a "quality education * * * qualified and expert teachers * * * necessary tutorial and support services * * * in the area of the basic academic skills [and] accurate and factual progress reports" and "furnished * * * false and misleading progress reports which reflected that * * * [Michael] was making satisfactory progress in his studies and promoted * * * [Michael] each year to the next class grade." It is readily apparent that the claims entail an analysis of the educational function. The sufficiency of tutorial services, academic assessments as to Michael's

performance and determinations relative to graduation are not matters that should be subject to judicial review (see *Hoffman v Board of Educ.,* 49 NY2d 121, 126, *supra; Hunter v Board of Educ.,* 47 Md App 709, 716, mod 292 Md 481, *supra*). The quality of the education and qualifications of the teachers employed by the private school are concerns not for the courts, but rather for the State Education Department and its commissioner (Education Law, § 5003).

Accordingly, the first two causes of action sounding in contract must be dismissed.

We turn now to the third and fourth causes of action in which it is alleged that the Waldorf School "represented [it was a school] of the highest quality; that * * * Michael * * * would receive a greater education at said private school than that offered by the school system in the * * * community; that * * * Michael * * * would receive personalized and individualized instruction in the basic academic skills when required; that the school would furnish * * * periodic progress reports * * * [and] that * * * [Michael] was making satisfactory progress". These representations are claimed to have been false since the school failed to provide a quality education, necessary personal and individual instruction, or an education superior to that offered by the public school system and further, it is claimed that the school rendered false and misleading progress reports and improperly promoted Michael to the next successive grade. In addition, it is claimed that these representations were made with the intent to deceive plaintiffs in order to keep Michael enrolled at the school and that plaintiffs relied upon such representations by continuing Michael's matriculation.

The claims as alleged in these causes of action are founded upon the tort of fraudulent misrepresentation or deceit (see *Kountze v Kennedy,* 147 NY 124, 128-130; 1 Harper & James, Law of Torts, § 7.1, p 528; Prosser, Torts [4th ed], §§ 107, 108, pp 699-715). Courts have thus far refused to bar actions for intentional tort against educators although most have been dismissed for pleading deficiencies (see, e.g., *Donohue v Copiague Union Free School Dist.,* 64 AD2d 29, 39, affd 47 NY2d 440, *supra; Peter W. v San*

*Francisco Unified School Dist.,* 60 Cal App 3d 814, 827, *supra*). An action for intentional tort has been held to be viable upon the ground that those persons entrusted with the duty to educate our young should not be shielded from liability for their intentional wrongs (*Hunter v Board of Educ.,* 292 Md 481, ___, 439 A2d 582, 586-587, *supra*). We do not disagree. An action for fraudulent misrepresentation in the educational context bespeaks an abuse of the trust imparted to our educators and should be entertained by the courts. Deception has no place in the educational process. While negligent misrepresentations and judgmental errors ought not be actionable (see *Peter W. v San Francisco Unified School Dist., supra,* p 827), misrepresentations coupled with the element of *scienter* should result in the imposition of liability.

Nevertheless, the claimed misrepresentations in the present case are not actionable. Those claims concerning misrepresentation as to the quality or comparative quality of the education to be provided by the Waldorf School are not statements of fact capable of proof, but rather opinions which ought not provide a basis for the imposition of liability (*Banner v Lyon & Healy,* 249 App Div 569, 571, affd 277 NY 570; *Podolsky v Sandler,* 161 NYS 363, 364).

The claim founded upon the alleged misrepresentations as to the accuracy of Michael's progress reports is contradicted by the record which overwhelmingly demonstrates that Michael's parents were, in fact, apprised of their son's academic deficiencies. Starting in the first grade, his teachers reported that Michael tended to self-absorption and had a habit of ignoring directives. He lost interest in English studies in the latter part of the year and evidenced difficulty in arithmetic. In second grade he had the same teacher, who told Michael's parents that their son had a phonetic problem or inattentive ear which led to a reading problem. The parents were told that Michael was "not yet truly reading". In the latter half of the year his teacher reported that Michael made "little progress with reading". As to his reading ability his teacher hoped that "[w]ith continued improvement of [Michael's] motor skills and further practice in Third Grade, this difficulty should clear up". His arithmetic skills concerning the difference be-

tween odd and even numbers were "understood * * * better last year". His third grade reports were no less encouraging, let alone false. He evidenced reading problems and his parents were given instructions for home lessons. He did evidence more success in arithmetic but had trouble with multiplication and division tables. His general tendency to become distracted remained and he often "seem[ed] to be in a world very much of his own and far away from the task required at the moment". His fourth grade report was somewhat vague, but the teacher noted that "Michael needs clear directions, peaceful surroundings and an understanding supervisor whenever he writes, reads or does arithmetic". The report stated further that a meeting between Michael's mother and his teacher had favorable results. Later that year it was noted that "Michael needs a lot of attention and help from his teacher in arithmetic and in English. In both subjects he is not yet at grade level. He has, however, just recently started to write little stories". In the fall semester of the fifth grade, the following report was sent to his parents:

"Michael is full of good intentions with regard to schoolwork, but he is largely unable to carry them out, partly because he cannot keep hold of them in the presence of other children, partly because he is out of his depth academically most of the time. Michael is virtually a non-reader, except for easy one-syllable words. He can write simple, straight forward sentences on his own, legibly and understandably, with phonetic spelling. On prepared weekly spelling tests his scores are uniformly low. He can do some fifth grade arithmetic.

"Reports from all special teachers indicate that while Michael is willing his progress is minimal."

Clearly, the record fails to bear out of the claim that the school made false representations to the parents. Michael's matriculation was allegedly based on the school's policy not to traumatize the child and its professional judgment that learning abilities were better when one stayed with persons in their own age group. No proof has been submitted to the contrary. The reports were not only accurate, but contradict any claim that the school engaged in a planned course of deception.

■ Finally, the plaintiffs have failed to support the allegation that the school misrepresented that it would provide necessary tutorial services. The record indicates that additional educational help was provided to Michael during the third and fourth grades and that he was tutored in reading in the third grade. Where the misrepresentation is a promise to perform a service in the future, an action for deceit is not available and plaintiff is relegated to contractual remedies unless it can be shown that the promisor had no intention of performing the future act at the time the promise was made (*Rudman v Cowles Communications,* 30 NY2d 1, 9; *Adams v Clark,* 239 NY 403, 410; *Brown v Lockwood,* 76 AD2d 721, 731-733). Since special attention was given to Michael and tutoring was in fact provided, the statement of future intention was kept and may not provide a basis for recovery.

Thus, the third and fourth causes of action must similarly be dismissed.

MOLLEN, P. J., MANGANO and RUBIN, JJ., concur.

Order of the Supreme Court, Nassau County, entered August 18, 1981, reversed, on the law, without costs or disbursements, and motion for summary judgment granted.