**Annie R. GALLY, Plaintiff,**

v.

**COLUMBIA UNIVERSITY, Columbia University School of Dentistry and Oral Surgery, Defendants.**

No. 97 Civ. 4994(BSJ).

United States District Court, S.D. New York.

Sept. 28, 1998.

Jeffrey M. Duban, New York, NY, for plaintiff.

Schoeman, Marsh & Updike, L.L.P. (Laura D. Barbieri), New York, NY, for defendants.

## MEMORANDUM & ORDER

JONES, District Judge.

This case involves the legal relationship between a student and a university and the extent to which the courts should intercede in resolving grievances that arise within the academic community. After failing a required course and taking a medical leave of absence, plaintiff Annie R. Gally, a former student of Columbia University School of Dentistry and Oral Surgery ("SDOS"), brings this action against SDOS and Colum-

bia University alleging that defendants mistreated her while she was a student at SDOS. Based on her allegations, plaintiff seeks damages for breach of contract and constructive discharge.

Pending is defendants' motion to dismiss or, in the alternative, for summary judgment. For the following reasons, defendants' motion to dismiss is granted.

## BACKGROUND

The following facts are from plaintiff's complaint, which is presumed to be true for purposes of defendants' motion to dismiss, and from documents incorporated by reference in the complaint.

SDOS is a highly competitive and selective dental school that provides professional training programs and services to students seeking a Doctor of Dental Surgery ("D.D.S.") degree. SDOS is accredited by the American Dental Association ("ADA"), and operates pursuant to ADA policies and standards, as well as SDOS's Code of Conduct and SDOS's Academic Policies and Procedures.

Plaintiff enrolled at SDOS in the fall of 1994. Beginning in her first semester, plaintiff claims to have observed "rampant cheating" among fellow students. Proctors and professors allegedly allowed this cheating to occur by looking the other way during exams. Plaintiff claims that she brought the cheating to the attention of SDOS faculty and administrators, including the Academic Dean and the Dean of Students, but that they were "entirely dismissive of plaintiff's concerns."

According to plaintiff, the widespread cheating and SDOS's failure to address plaintiff's concerns "deeply offended and upset" her, devalued the educational services that SDOS had promised to provide, and breached SDOS' promises to abide by the SDOS Code of Conduct[1] and "[t]o prepare gradu-

---

1. The SDOS Code of Conduct provides, in relevant part:

 1. Members of the SDOS community are expected to abide by the highest ethical standards and must demonstrate by their con-

 duct that they are suited to the study and practice of dentistry....

 2. The responsibilities of the faculty and administration regarding ethical conduct and violations are as follows:

ates with an understanding of the social, economic, societal and ethical aspects of the profession."

Plaintiff further alleges that in her second year at SDOS she "was subjected to the animosity" of Dr. Farhad Hadavi, her professor for Introduction to Operative Dentistry, a required second-year course. Without giving specific examples, plaintiff alleges that throughout the school year, Dr. Hadavi "gratuitously demeaned and denigrated plaintiff and her work, doing so openly and obnoxiously before the entire class." Plaintiff alleges that Dr. Hadavi "harbor[ed] bigoted hostility toward [her] based on her race, gender and ethnicity."[2] Plaintiff attributes this alleged hostility to the fact that Dr. Hadavi "upon information and belief, [is] a Muslim from Iran."

Plaintiff alleges that the mistreatment from Dr. Hadavi began after plaintiff missed the first session of Dr. Hadavi's course to attend a doctor's appointment. It continued, according to plaintiff, after plaintiff requested a project extension to enable her to sit shiva[3] for her recently deceased grandfather. Plaintiff alleges that Dr. Hadavi made "plaintiff the object of his uncontrollable animosity by announcing that anyone who took off from class because of illness or death did not 'deserve' to be a part of 'his' class."

Faced with what she categorizes as Dr. Hadavi's "bigotry and anti-semitism," plaintiff claims that she approached SDOS administrators for help, but that they were "dismissive of her concerns." During the same time, plaintiff alleges that her "ongoing protestations concerning cheating were similarly rebuffed."

At the conclusion of her second year, in June 1996, plaintiff took her final exam for Dr. Hadavi's course. The exam consisted of both clinical and written parts. Plaintiff passed the clinical part of the exam, but failed the written part. Plaintiff now attributes her failure to the fact that she "internaliz[ed] the demeaning criticisms" directed at her by Dr. Hadavi.

Plaintiff complains that, contrary to SDOS policies, her exam results were not posted until September 1996, at the start of her third year.[4] Upon learning that she had failed the written portion of the exam, plaintiff made plans with Dr. Hadavi to retake the exam and to schedule a review session. According to plaintiff, Dr. Hadavi scheduled the review session for the same day as Yom Kippur. Eventually, Dr. Hadavi rescheduled the review session for a different date.

Plaintiff claims that she subsequently spoke to the administration about Dr. Hadavi's alleged "bias and continuing abuse of her." She also claims that she spoke to the Dean of Students about remedial help for the written exam. The Dean referred plaintiff to a student tutor, but plaintiff complains that the student failed to give her any assistance.

After attending a review session run by Dr. Hadavi, plaintiff took the written portion of the exam for a second time with other students who had previously failed. Plaintiff alleges that Dr. Hadavi, who proctored the exam, "carried on in a conspicuously disgruntled manner" during the exam. Once again, plaintiff failed the exam.

On October 8, 1996, the Third Year Class Committee of SDOS notified plaintiff that she could no longer treat patients in the school clinic until she passed her exam, and that the exam would be readministered on

---

a) All faculty and administration must attempt to foster a professional atmosphere, to dissuade unethical conduct and to deal with it appropriately if it does arise.
b) All students should receive fair and equal treatment.

**2.** Plaintiff does not bring a claim for discrimination.

**3.** "Shiva" is the seven-day mourning period observed by Jews.

**4.** SDOS's Academic Policies and Procedures provides, in relevant part:

Final grades for all courses are reviewed at the close of the academic year. If a student has failed any course, the class committee determines how that failure can be corrected. That may be done by:
1) re-examination on recommendation of the course director . . .
2) successful completion of a remedial program determined by the course director and the committee . . .

December 9, 1996.[5] Plaintiff, however, believed that waiting until December to take the exam would effectively halt her progress in the D.D.S. program. Accordingly, she complained to the Dean of Students about the date and asked for an earlier exam date. Plaintiff's parents also met with the Dean to request an earlier exam date.

On October 18, 1996, the Third Year Class Committee and SDOS administrators held a hearing on plaintiff's "appeal" of the December exam date. At the conclusion of that hearing, SDOS gave plaintiff the option of taking the exam in October with Dr. Hadavi or waiting until December to take the exam with another proctor. Plaintiff contends that SDOS gave her this option as "a further attempt to antagonize and retaliate against [her]." Plaintiff chose the October exam date.

Plaintiff took the exam for a third time on October 25, 1996. Plaintiff claims that this exam, unlike the prior two, was not a "straightforward multiple choice" exam, but instead consisted of fifty-two questions, many with multiple parts. Plaintiff also claims that for the third exam the minimum passing score was raised from 70% to 75%. On October 29, 1996, plaintiff learned that she had scored a 61% on the exam and failed yet again.

Plaintiff claims that at least ten questions on the third exam were "incorrectly graded as wrong." However, according to plaintiff, officials at SDOS refused to regrade the exam because it would "make no difference" as to whether plaintiff passed the exam. Plaintiff attributes her failing score and the discrepancy in the ten questions to what she terms "[Dr.] Hadavi's middling command of

English and his difficulty in framing clear and coherent questions."

On or about November 6, 1996, plaintiff sought and was granted a medical leave of absence from SDOS for up to one year. In April 1997, plaintiff sought a tuition rebate based on her leave. Plaintiff alleges that the SDOS administration delayed in granting the rebate.

On July 9, 1997, plaintiff commenced this lawsuit against defendants seeking damages under two claims. First, plaintiff claims breach of contract, based on defendants' alleged violation of provisions set forth in the ADA and SDOS guidelines and by defendants' alleged breach of the covenant of good faith and fair dealing. Plaintiff seeks reliance damages on this claim for expenses she incurred while attending SDOS.

Second, plaintiff alleges constructive discharge, claiming that defendants' alleged conduct diminished the value of her education and the reputation of SDOS, thereby harming her academic experience and causing her to leave the D.D.S. program. Although plaintiff acknowledges that there is no existing cause of action for constructive discharge from education, she asks the Court to create such a cause of action based on analogies to constructive discharge from employment, constructive eviction from housing, and constructive abandonment in domestic relations. Plaintiff seeks compensatory damages of at least $1.5 million plus punitive damages of at least $1 million on this claim.

## DISCUSSION

Defendants move to dismiss plaintiff's complaint for lack of subject matter jurisdiction, failure to file within the statute of limitations period, and failure to state a claim.[6]

---

5. The SDOS Bulletin provides, in relevant part:
 A student may be admitted to the second, third, or fourth year of the dental curriculum only upon successful completion of all courses and recommendation of the officers of instruction under whom the student has studied the preceding year....
 Course failures in all years of the curriculum must be corrected according to the directives of the appropriate class committee. At the discretion of the class committee, in any year of the curriculum, students may be requested to repeat the year or may be dismissed for

poor scholarship. Each class committee may direct a student whose performance is marginal to undertake additional work to correct deficiencies and strengthen overall performance in any discipline.

6. Alternatively, defendants ask the Court to convert the motion to one for summary judgment. Because the Court concludes that plaintiff has failed to state a claim it need not consider this part of defendants' motion. Accordingly, the Court has not considered the affidavits or accompanying exhibits submitted by defendants in support of their motion for summary judgment.

## A. Subject Matter Jurisdiction

The Court's subject matter jurisdiction over this action is based on the diversity of citizenship of the parties. Pursuant to 28 U.S.C. § 1332, the Court has diversity jurisdiction if the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

■ The Court determines the amount in controversy based on plaintiff's allegations "at the time the action is commenced." *Tongkook America, Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir.1994). It is plaintiff's burden to prove to a "reasonable probability" that the amount in controversy exceeds the jurisdictional amount. *Tongkook*, 14 F.3d at 784. Dismissal is not warranted unless it appears " 'to a legal certainty that the claim is really for less than the jurisdictional amount.' " *Id.* (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938)).

Here, plaintiff seeks damages of at least $100,000 (based on school-loan indebtedness) for her breach of contract claim and over $2.5 million for her constructive discharge claim. Defendants argue that plaintiff fails to meet the jurisdictional amount because the constructive discharge claim is frivolous and because the breach of contract claim can result in damages of no more than $8,503.24—the amount plaintiff incurred during her aborted third year at SDOS. The Court disagrees.

■ First, although the Court rejects plaintiff's attempt to create a new cause of action for constructive discharge, *see supra* Part D, the dismissal of this claim does not divest the Court of jurisdiction. *See Tongkook*, 14 F.3d at 784; *Lombard v. Economic Dev. Admin. of P.R.*, No. 94 Civ. 1050, 1998 WL 118164, at *1 (S.D.N.Y. Mar. 17, 1998); 15 James Wm. Moore et al., Moore's Federal Practice ¶ 102.104[3] (3d ed. 1997) ("If diversity jurisdiction existed at the time the case was filed, it is not affected by the dismissal of one of the claims, whether on motion to dismiss or summary judgment, even though the amount recoverable on the remaining claim is less than the required amount."). Second, even if the Court were to exclude the damages claimed for constructive discharge, plaintiff would still meet the jurisdictional amount based on her contract claim. Indeed, however dubious plaintiff's contract claim, the Court cannot find to a legal certainty that plaintiff's damages on her claim fail to exceed $75,000. *See Alter v. Bogoricin*, No. 97 Civ. 0662, 1997 WL 691332, at *3 (S.D.N.Y. Nov. 6, 1997). Accordingly, plaintiff's complaint will not be dismissed for lack of subject matter jurisdiction.

## B. Statute of Limitations

Next, defendants argue that plaintiff's grievances should properly have been brought as a state court proceeding pursuant to Article 78 of New York's Civil Practice Law and Rules. Under Article 78, plaintiff's claims would have been barred by a four-month statute of limitations. *See* N.Y. C.P.L.R. §§ 217(1), 7801 (McKinney Supp. 1998). Defendants ask the Court to convert plaintiff's action into an Article 78 proceeding and dismiss it as untimely.

■ Article 78 provides procedures for parties seeking "[r]elief previously obtained by writs of certiorari, mandamus or prohibition." *Id.* § 7801. Proceedings under Article 78 "are typically the avenue for parties challenging administrative actions by governmental agencies or by the decisionmaking bodies of private entities." *Clarke v. Trustees of Columbia Univ.*, No. 95 Civ. 10627, 1996 WL 609271, at *2 (S.D.N.Y. Oct. 23, 1996).

■ Here, plaintiff seeks neither to compel nor to prohibit any action by defendants. Instead, plaintiff seeks monetary damages for injuries allegedly suffered as a result of defendants' breach of its contractual obligations. As such, plaintiff's action is properly before the Court, will not be converted to an Article 78 proceeding, and is not time-barred. *See Pell v. Trustees of Columbia Univ.*, No. 97 Civ. 0193, 1998 WL 19989, at *20 (S.D.N.Y. Jan. 21, 1998) (rejecting argument that student's suit against school for breach of contract had to brought in Article 78 proceeding); *id.* (noting that Article 78 proceedings generally "are not the proper vehicle for enforcement of private contractual

rights"); *Keles v. Manhattan College Corp.,* No. 88 Civ. 8080, 1993 WL 331582, at \*3 n. 1 (S.D.N.Y. Aug. 20, 1993) ("because the relief sought by plaintiff was money damages for an alleged breach of contract and not mandamus, Article 78 is not the exclusive remedy"), *aff'd,* 29 F.3d 622 (2d Cir.1994).

### C. *Motion to Dismiss*

Plaintiff's first claim is for breach of contract. Defendants move to dismiss this claim for failure to state a claim, pursuant to Rule 12(c), Federal Rules of Civil Procedure.

The standard for prevailing on a motion brought under Rule 12(c) is the same as for a motion brought under Rule 12(b)(6). *See Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.), *cert. denied,* 513 U.S. 816, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994). In deciding defendants' motion, the Court must view the pleadings in the light most favorable to plaintiff and accept the factual allegations set forth in the complaint. *See id.* The complaint will not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts which would entitle her to relief. *See id.*

### 1. *Breach of Contract*

Plaintiff's contract claim alleges that defendants breached their obligations to abide by SDOS policies and procedures and breached the implied covenant of good faith and fair dealing. In particular, plaintiff alleges that defendants: (1) failed to address her allegations of cheating and, in fact, acquiesced in the cheating at SDOS; (2) failed to correct the "abusive and discriminatory treatment" she allegedly endured from Dr. Hadavi and, in fact, contributed to that abuse and discrimination as retaliation for plaintiff's allegations of cheating; (3) failed to promptly inform plaintiff after her second year that she had failed Dr. Hadavi's course; (4) failed to promptly provide remedial services for Dr. Hadavi's course; and (5) failed

to promptly process plaintiff's tuition rebate after she took her medical leave of absence.

 New York courts have suggested that a student can sue a school for breach of contract.[7] *See Clarke,* 1996 WL 609271, at \*5; *Keles v. New York Univ.,* No. 91 Civ. 7457, 1994 WL 119525, at \*4–5 (S.D.N.Y. Apr. 6, 1994), *aff'd,* 54 F.3d 766 (2d Cir.), *cert. denied,* 516 U.S. 943, 116 S.Ct. 380, 133 L.Ed.2d 303 (1995); *Olsson v. Board of Higher Educ.,* 49 N.Y.2d 408, 413–14, 426 N.Y.S.2d 248, 402 N.E.2d 1150 (1980). When a student enrolls at a university, an implied contract arises: if the student complies with the terms prescribed by the university, she will obtain the degree she seeks. *See Carr v. St. John's Univ.,* 17 A.D.2d 632, 231 N.Y.S.2d 410, 413 (2d Dep't), *aff'd* 12 N.Y.2d 802, 235 N.Y.S.2d 834, 187 N.E.2d 18 (1962); *see also Vought v. Teachers College, Columbia Univ.,* 127 A.D.2d 654, 511 N.Y.S.2d 880, 881 (2d Dep't 1987). Implicit in this contract is that the university must act in good faith in dealing with the student. *See Olsson,* 49 N.Y.2d at 414, 426 N.Y.S.2d 248, 402 N.E.2d 1150. Also implicit is that the student must fulfill her end of the bargain by satisfying the university's academic requirements and complying with its procedures if she hopes to receive her degree.

 The terms of the implied contract are supplied by the bulletins, circulars and regulations made available to the student. *See Clarke,* 1996 WL 609271, at \*5 (citing *Vought,* 511 N.Y.S.2d at 881). "Thus, 'if the contract with the school were to provide for certain specified services, such as for example, a designated number of hours of instruction, and the school failed to meet its obligation, then a contract action with appropriate consequential damages might be viable.'" *Clarke, id.* (quoting *Paladino v. Adelphi Univ.,* 89 A.D.2d 85, 454 N.Y.S.2d 868, 873 (2d Dep't 1982)).

 Not every dispute between a student and a university is amenable to a breach of contract claim, however. Where the es-

---

7. The Court rejects defendants' argument that no contract existed between plaintiff and SDOS because the SDOS Bulletin contained a contract disclaimer. While SDOS could disclaim the existence of a specific promise through the use of

such a disclaimer, *see Prusack v. State,* 117 A.D.2d 729, 498 N.Y.S.2d 455, 456–57 (2d Dep't 1986), it could not unilaterally disclaim all contractual relations between the parties.

sence of the complaint is that the school breached its agreement by failing to provide an effective education, the complaint must be dismissed as an impermissible attempt to avoid the rule that there is no claim in New York for "educational malpractice." *See Andre v. Pace Univ.*, 170 Misc.2d 893, 655 N.Y.S.2d 777, 779 (N.Y.App.Term 1996); *Sirohi v. Lee*, 222 A.D.2d 222, 634 N.Y.S.2d 119, 120 (1st Dep't 1995); *Paladino*, 454 N.Y.S.2d at 872; *see also Keles v. New York Univ.*, 1994 WL 119525, at *6. Moreover, claims that sound in tort and ask the Court to involve itself in the subjective professional judgments of trained educators will not survive a motion to dismiss merely because the plaintiff couches her claims in terms of breach of contract. *See Sirohi*, 222 A.D.2d 222, 634 N.Y.S.2d at 120; *see also Olsson*, 49 N.Y.2d at 413, 426 N.Y.S.2d at 251. Indeed, the mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted. The application of contract principles to the student-university relationship does not provide judicial recourse for every disgruntled student.

Here, stripped of its conclusory, inflammatory, and disjointed allegations, plaintiff's complaint fails to state a claim for breach of contract.

#### a. *Cheating*

■ First, plaintiff's allegations that SDOS faculty and administrators failed to adequately address plaintiff's concerns about cheating and, in fact, acquiesced in such cheating boils down to a claim for educational malpractice. Plaintiff complains that the cheating at SDOS "deeply offended and upset" her and devalued the educational services that SDOS had promised to provide her. These allegations go to whether SDOS provided an effective education—the essence of an educational malpractice claim. Plaintiff also claims that SDOS breached its promises to abide by the SDOS Code of Conduct and to "prepare students with an understanding of the social, economic, societal and ethical aspects of the profession." Consideration of these allegations would require the Court to evaluate SDOS's methods for dealing with

complaints of cheating. It also would require the Court to engage in an evaluation of the process of learning and school administration.

■ The bar against educational malpractice claims recognizes that universities are empowered to set their own academic standards and procedures. The decision as to whether a student has complied with those standards and procedures is best "left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis." *Olsson*, 49 N.Y.2d at 413, 426 N.Y.S.2d 248, 402 N.E.2d 1150. Inextricably intertwined with the authority to set academic standards is the authority to set standards for ethical behavior. The university is entrusted to implement its ethical policies and to police its student body. As with academic criteria, the decision as to how to address allegations of cheating is best left to the professional educators and administrators who deal with such allegations on a regular basis. Given this backdrop, it is clear that plaintiff's allegation that SDOS failed to adequately address plaintiff's concerns about cheating does not state a claim on which relief could be granted.

■ Moreover, the general promises about ethical standards which plaintiff now points to are far different from the types of specific promises which have led to valid breach of contract claims against universities. Plaintiff does not point to a specific promise to, say, provide certain hours of instruction, state-of-the art facilities, one-on-one mentors, or particular courses. Unlike these obligations, SDOS's alleged promises about ethical conduct are subject to neither quantification nor objective evaluation.

■ In considering plaintiff's allegations about cheating, the Court further notes that plaintiff's complaints of cheating allegedly began during her first semester at SDOS. Plaintiff did not leave school, however, until the start of her third year, after she had failed Dr. Hadavi's exam for a third time. Thus, insofar as defendants "breached" a promise to plaintiff, it is apparent that plaintiff did not consider that promise material to the parties' contractual relationship at the

time. In fact, by plaintiff's own allegations, it was her inability to pass Dr. Hadavi's course, and not any action by SDOS, that caused her to leave school.[8]

Accordingly, plaintiff cannot sustain a claim for breach of contract based on her allegations of cheating.

### b. *Mistreatment*

Plaintiff's allegations of mistreatment by Dr. Hadavi also must fail. Putting aside plaintiff's utter failure to provide any specific examples of Dr. Hadavi's so-called demeaning treatment or SDOS's complicity in that treatment, plaintiff is unable to articulate any basis for concluding that either Dr. Hadavi's behavior or SDOS's actions, even if true, would amount to a recognizable claim for breach of contract.

 In support of her claim, plaintiff points to a provision in SDOS's Code of Conduct, which provides "[a]ll students should receive fair and equal treatment." This provision, however, is merely a general statement of adherence by SDOS to existing anti-discrimination laws. It does not create a separate and independent contractual obligation. *See Blaise–Williams v. Sumitomo Bank, Ltd.,* 189 A.D.2d 584, 592 N.Y.S.2d 41, 42 (1st Dep't 1993) (general statement of anti-discrimination policy in employee handbook "may not serve as a basis for a breach of contract claim"). Moreover, even if that clause did provide a specific enforceable promise, plaintiff fails to allege facts from which to conclude that that promise was breached. Plaintiff does not claim that Dr. Hadavi treated other students differently[9] or that she somehow was specially disadvantaged by Dr. Hadavi's teaching style. Indeed, plaintiff's own allegations demonstrate that Dr. Hadavi treated his students equally,

giving them the same objective multiple-choice written exams and telling them that *"anyone* who took off from his class because of illness or death did not 'deserve' to be a part of 'his' class." Compl. ¶ 43 (emphasis added). Furthermore, by plaintiff's own admission she was allowed to take Dr. Hadavi's exam three times.[10]

In short, while reasonable minds may differ as to the effectiveness of Dr. Hadavi's style, the fact that Dr. Hadavi may have been harsh or even belittling to plaintiff does not create a valid cause of action. To hold otherwise would be to open the floodgates to a slew of claims by students who found their professors' techniques personally offensive. Such claims are better left to the sound handling of school administrators.

### c. *Timely Notification*

Turning to plaintiff's claim that defendants failed to promptly inform her after her second year that she had failed Dr. Hadavi's course, the Court does not find that such an allegation states a claim for breach of contract.

 Plaintiff bases this claim on a provision in SDOS's Academic Policies and Procedures which reads, "[f]inal grades for all courses are reviewed at the close of the academic year." This provision, however, appears to be merely aspirational, and does not enumerate a specific, enforceable promise. Indeed, the mere delay in reporting grades does not give rise to a cause of action against a university, absent allegations that the university made a specific promise to report such grades by a certain date and that such a promise was material to the student's contractual relationship with the university.

 Moreover, even if this provision did create an enforceable promise, SDOS sub-

---

8. Notably as well, since plaintiff has not alleged that her performance at SDOS was graded on a curve, her only basis for claiming that the alleged cheating deprived her of the benefit of her bargain is that the cheating caused her emotional hardship. However, her assertion that the alleged cheating so upset her that she could not perform is belied by her claim that she had "no problem with any other course" at SDOS besides Introduction to Operative Dentistry.

9. In fact, plaintiff expressly disavows any claim for discrimination.

10. Plaintiff's complaint that the exam format and minimum passing score were changed prior to her third exam does not state a claim on which relief can be granted. Test format and grading standards are among the quintessential examples of decisions that are best left to school faculty and administrators.

stantially complied with its obligations as a matter of law. By plaintiff's own admissions, SDOS promptly reviewed plaintiff's performance in Dr. Hadavi's course as soon as Dr. Hadavi posted plaintiff's results. SDOS then allowed plaintiff to take two re-examinations of Dr. Hadavi's course. SDOS also provided plaintiff with a hearing on her complaints about the third exam date and then accommodated her request to take the third exam in October. Thus, by plaintiff's own factual allegations, plaintiff fails to state a claim for breach of contract on this basis.

#### d. *Remediation and Rebate*

Finally, neither plaintiff's allegation that defendants failed to promptly provide remedial services nor her allegation that defendants delayed in processing her request for a tuition rebate states a valid claim for relief.

 First, plaintiff fails to point to any specific provisions in SDOS's publications that were violated by either of these alleged failings. Second, as to remediation, by plaintiff's own admission, defendants provided some remedial services including a review session run by Dr. Hadavi. Determining whether those remedial services were adequate would involve the Court in a subjective evaluation of whether SDOS provided adequate academic services. Such a determination is better left to school administrators who are experienced in deciding what measures need to be taken to assist a student in completing a course. Finally, as to a tuition rebate, plaintiff has failed to allege that she was entitled to a rebate or that SDOS's alleged delay in processing that rebate prevented her from receiving the benefit of her bargain.

\* \* \* \* \* \*

In sum, plaintiff fails to allege that SDOS breached any contractual obligation to provide certain specified services. While plaintiff attempts to disguise her claim as one for breach of contract, her allegations amount to nothing more than a claim for educational malpractice. Accordingly, defendants' motion to dismiss plaintiff's first claim for failure to state a claim is granted.

#### 2. *Constructive Discharge*

In her second claim, plaintiff asks the Court to create a new cause of action for constructive discharge from education, based on her allegation that defendants' alleged conduct harmed her academic experience and caused her to leave the D.D.S. program. Defendants move to dismiss this claim for failure to state a claim.

 Whether to recognize a new cause of action "is largely a question of policy." *Donohue v. Copiague Union Free Sch. Dist.*, 47 N.Y.2d 440, 445, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1979) (Wachtler, J., concurring). "Critical to such a determination is whether the cause of action sought to be pleaded would be reasonably manageable within our legal system." *Id.* Here, recognition of a cause of action for constructive discharge from education would undermine the existing legal framework and run counter to important policy considerations.

 The bar against educational malpractice claims in New York reflects the realization that most decisions related to education are best left to the sound judgment of professional educators who monitor students on a daily basis. As a result, "the courts have quite properly exercised the utmost restraint in applying traditional legal rules to disputes within the academic community." *Olsson*, 49 N.Y.2d at 413, 426 N.Y.S.2d 248, 402 N.E.2d 1150; *see also Andre*, 655 N.Y.S.2d at 779 ("the courts of [New York] have consistently declined to entertain actions sounding in 'educational malpractice,' although quite possibly cognizable under traditional notions of tort law, as a matter of public policy."). The one exception has been in the area of contract law, where the courts have allowed a student to recover from a university for the breach of a promise to provide specific services. *See supra* Part C.1. This exception, however, should not be misunderstood for the rule; even while applying contract principles, the courts have been careful to disallow claims that would involve the judiciary in reviewing the day-to-day judgments of educators.

Given this hesitancy to extend traditional notions of tort law to the student-university

relationship, the Court finds no reason to recognize plaintiff's constructive discharge claim. Such a cause of action would enable a student to avoid the bar against educational malpractice claims, as well as the limitations on breach of contract claims. Conceivably, any student who failed to complete his or her university studies could bring an action alleging that his or her failure was attributable to university policies. A single remark by a professor, made with the best intentions, could entangle a university in litigation. The entire conception of the university as a place for experimentation and development would be undermined if administrators had to conform curriculum and curtail faculty behavior so that individual students were not offended. Such a result could frustrate the interests of the university, the student body, and society as a whole.

Nevertheless, plaintiff asks the Court to analogize to causes of action for constructive discharge from employment, constructive eviction from housing, and constructive abandonment in domestic relations. The Court finds these analogies unpersuasive. Notably, all of plaintiff's examples involve causes of action that developed in furtherance of already existing laws and clearly articulated policies. Thus, constructive discharge from employment emerged to strengthen the protections of Title VII, constructive eviction emerged as a means to effectuate landlord-tenant policies, and constructive abandonment emerged to advance marital laws. In each of these instances, the concept of "constructive" injury served to empower the individuals whose interests the laws were designed to protect. In contrast, here there is no existing legal framework that would be strengthened if the Court accepted plaintiff's cause of action. Indeed, as explained above, recognition of a cause of action for constructive discharge from employment would frustrate, rather than further, legitimate policy concerns.

In short, plaintiff has offered no compelling reason why the Court should undermine legal precedent and accepted policy by allowing a cause of action for constructive discharge from education. The Court acknowledges plaintiff's sincere belief that she was injured by SDOS's conduct and by Dr. Hadavi's treatment of her. The law, however, does not provide a remedy for every injury. Defendants' motion to dismiss plaintiff's constructive discharge claim for failure to state a claim is granted.

### CONCLUSION

Defendants' motion to dismiss plaintiff's complaint for failure to state a claim, pursuant to Rule 12(c), is granted.

The Clerk is directed to enter judgment for defendants.

**SO ORDERED:**