Pearlie TRIPP, Plaintiff,

v.

LONG ISLAND UNIVERSITY,
Defendants.

No. 96 CV 2096.

United States District Court,
E.D. New York.

March 3, 1999.

Pearlie Tripp, Brooklyn, NY, pro se.

Cullen & Dykman, (James Gerald Ryan), Garden City, NY, for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff, an African–American woman, filed this action on April 29, 1996 alleging that defendant, Long Island University ("the University"), discriminated against her on the basis of her race, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("section 1981"), the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), and the Human Rights Law of the State of New York. She seeks $20 million.

This court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1367.

Plaintiff was represented by counsel when the complaint was filed but she has acted *pro se* since her counsel resigned in December 1996. On March 13, 1998, defendant moved for summary judgment. The court considers the defendant's motion on submission of both parties.

### I

The complaint alleges in substance that from 1993 to the filing of the complaint, she was enrolled in the Masters Degree in Psychology Program at the University, and that the University, through its employees, purposefully denied plaintiff the right to contract free from racial considerations and engaged in a pattern of racial discrimination designed to prevent her from completing her masters degree on the same basis as similarly situated white persons.

The alleged discriminatory acts are: 1) around July 1993, a faculty member of the psychology department, Dr. Robert Fudin, told plaintiff, "you are in the wrong department" when he saw her wandering the hallways; 2) in his role as plaintiff's independent study advisor, Dr. Fudin criticized plaintiff's research paper "with intent to discriminate" and "in order to force her to leave the [Program]"; 3) Dr. Fudin

"threatened" to give plaintiff a poor grade in order to force her to leave the Program; and 4) the University "forced" plaintiff to transfer from the Psychology Department to the Counseling Department "in order to avoid the discriminatory atmosphere of Psychology Department."

In an affidavit submitted to the court, Dr. Fudin states that plaintiff's paper was poorly researched and written and that in his opinion plaintiff's grade is a fair evaluation of her work. He denies ever having said to plaintiff she was in the wrong department. Finally, the University states that plaintiff voluntarily transferred from the psychology department to the counseling department.

### II

Plaintiff is a fifty-five year old, African–American woman. Her husband died of a brain disorder in 1978 in the psychiatric ward of Kings County Hospital. One of her three sons was shot and killed in 1987. Her thirty-four year old son has been diagnosed as a schizophrenic and, plaintiff says, is "sometimes hard to deal with."

Despite these difficult family circumstances, plaintiff has led an industrious life. She worked for NYNEX as a directory assistant for twenty-six years. For seventeen of those years, she was responsible for instructing and training new directory assistants. Plaintiff retired from NYNEX in 1997.

Around 1985, plaintiff began taking classes toward a bachelor's degree. She started at Manhattan Community College, and then attended Pace University where she took classes in the night program and the "associate's program." Around 1986, she was accepted to Pace University's bachelor of arts program but was unable to pursue her studies because one son was killed and the schizophrenic son had become sick. She took no classes for about four years.

Then in 1990, plaintiff was accepted to the Brooklyn Branch of the College of

New Rochelle. She worked at NYNEX at night and attended school during the day. Plaintiff received a B.A. in psychology in 1993 and graduated with honors.

Because her son was schizophrenic, plaintiff wished to study more psychology. In July 1993, she was accepted to the Masters Degree in Psychology Program at the University. Her tuition was fully covered by NYNEX. Because of scheduling conflicts at work, plaintiff could not work at night, and had to arrange a more flexible schedule with her department.

Gary Kose, the Chairman of the department, after discussion with her, gave her permission to do a three-credit independent study with a faculty advisor in lieu of taking classes. Plaintiff was assigned Dr. Robert Fudin, a professor in the psychology department.

In his affidavit, Dr. Fudin states that in an independent study project, a student and a faculty member agree on a suitable topic for the student to research and submit a paper at the end of the term. Plaintiff met with Dr. Fudin and agreed to write on a topic related to multiple personality disorder.

Plaintiff says she turned in the first draft of her paper some time in October 1993 but Dr. Fudin gave her no comments at that time. Dr. Fudin does not recall receiving a draft in October and says he received a draft in December. When he read plaintiff's paper, he found it to be poorly researched and poorly written. In his affidavit, he states that about nine of the eleven pages consisted of "isolated paragraphs, each of which appeared to be on the same topic, but with no apparent connection between them." Dr. Fudin noticed that the writing style in several paragraphs read like abstracts in published papers. He went to the library and, to the best of his recollection, "verified that portions of plaintiff's paper were copied word-for-word, or close to word-for-word, from published papers."

Dr. Fudin called plaintiff at home and arranged a meeting. They met at his office the next morning and discussed the paper. Plaintiff stated during her deposition that Dr. Fudin said to her, "I have to give you a poor grade. You can't write ... you committed plagiarism." She says she told him "if I made mistakes you are supposed to tell me this paper is lousy or do this thing again or tell me something." When he said again that he had to give her a poor grade, plaintiff said she was "not taking it," and they got into a "big argument." Dr. Fudin agreed to give her the opportunity to re-write the paper and suggested to her a possible outline for the new draft. Plaintiff said, "this is a nice outline." Then as she was about to leave the office, Dr. Fudin allegedly said to her, "they are going to throw you out of here, you see if they don't."

But in her letter dated August 18, 1994 to Charlotte Elkind, Associate Graduate Dean of the University, plaintiff recounted the conversation differently. She said that as she was leaving Dr. Fudin's office, he said to her, "they could throw you out of this program for committing plagiarism."

Plaintiff left Dr. Fudin's office in a very upset emotional state. According to her, "by the time [she] got outside [she] couldn't remember anything, nothing ... [because she was] carrying on and crying so bad." She says she attempted to re-write the paper but "from then on [she] went straight down hill [and could not] remember how to write anything." Every time she wrote, "it would get worse and worse."

Plaintiff submitted the final version of her paper in March 1994 with a handwritten note stating, "I decided to leave [the references] off and write what I had learned from the research. This is how I write." Plaintiff's paper, entirely handwritten, was not a "research paper" such as was assigned by Dr. Fudin. Dr. Fudin stated in his affidavit that he found plaintiff's paper to be unacceptable as a mas-

ter's-level research paper. Accordingly, he gave her a grade of "C + ".

Plaintiff went to speak to Associate Dean Charlotte Elkind toward the end of the spring semester of 1994. She told the Dean about the "poor start" she had gotten in the psychology department. When Dean Elkin recommended, "why don't you go to the counseling department?" plaintiff took her suggestion and met with Dr. Nass, Chairman of that department. She began taking classes there in the Fall of 1994.

The only other event mentioned in plaintiff's complaint is the incident where Dr. Fudin allegedly told plaintiff she was "in the wrong department." During her deposition, plaintiff testified that this incident occurred sometime in July 1993 when she first visited the psychology department. She had not theretofore met Dr. Fudin, and asked him, "Is this the psychology department?". Dr. Fudin said, "yes, it is .... but you're in the wrong department." He also allegedly said, "don't come in this department because if you do, you're going to lose your credits."

### III

A motion for summary judgment will be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to show there is no genuine factual dispute, and the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 2076–77, 119 L.Ed.2d 265 (1992).

When the moving party has carried its burden under Rule 56(c), the opponent must then come forward with specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

Plaintiff makes claims under sections 1981 and 2000d. Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory *to make and enforce contracts,* to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981 (emphasis supplied).

The elements of a section 1981 claim are: 1) plaintiff's membership in a racial minority; 2) discrimination based on one or more of the activities enumerated in the section; and 3) an intent to discriminate on the basis of race by the defendant. *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993). As in a Title VII case, once plaintiff has met the burden of proving by a preponderance of the evidence a prima facie case of discrimination, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. Should the defendant carry this burden, plaintiff must then prove, again by a preponderance of the evidence, that the legitimate reasons offered by the defendant were a mere pretext for discrimination. *See Yusuf v. Vassar College,* 35 F.3d 709, 713 (2d Cir.1994). Section 1981's prohibition applies to both private and state actors. *See id.* at 714.

While the plaintiff's initial burden to make a prima facie case is not heavy, the complaint must state more than conclusory allegations of discrimination. A court will not accept "naked assertions" unsubstantiated by specific factual support. *Martin v. New York State Dep't of Mental Hygiene,* 588 F.2d 371, 372 (2d Cir.1978) (per curiam)). Plaintiff must state that the defendant's acts were purposefully discriminatory and racially motivated, and "specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise

to a plausible inference of racially discriminatory intent." *Yusuf,* 35 F.3d at 713.

■ Plaintiff, an African–American woman, has met the first factor of the prima facie case. As for the second factor, plaintiff does not discuss the existence of or the nature of the contractual relationship between her and the University. But New York courts have held that when a student enrolls at a university, an implied contract arises. *See, e.g., Carr v. St. John's University,* 231 N.Y.S.2d 410, 413, 17 A.D.2d 632, 633 (2d Dep't 1962). The implicit terms of such a contract is that the university will act in good faith toward the student and the student will fulfill the university's academic requirements and comply with its ethical, procedural, and other standards. *See Gally v. Columbia University,* 22 F.Supp.2d 199, 206 (S.D.N.Y.1998).

The Civil Rights Act of 1991 amended section 1981 by, among other things, adding for the first time a section defining the term "make and enforce contracts." In *Patterson v. McLean Credit Union,* the Supreme Court had held that section 1981 "covers only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process." 491 U.S. 164, 179, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989). Under this interpretation, post-formation conduct such as "incidents relating to the conditions of employment" was specifically excluded from the category of enumerated activities in section 1981. *Id.*

The 1991 Amendments clarified that the term "to make and enforce contracts" encompassed "the making, performance, modification, and termination of contracts, and the *enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.*" 42 U.S.C. § 1981(b) (emphasis supplied). A term of the implied contract between the University and plaintiff was presumably the right to complete her degree without being subjected to discriminatory conduct. The second element of plaintiff's prima facie case is satisfied.

■ Plaintiff has not established the third factor, the intent to discriminate on the basis of race. Plaintiff alleges no set of facts giving rise to a plausible inference of purposeful discrimination. She states that Dr. Fudin told her "you are in the wrong department"; that he criticized her paper and "threatened" her with a poor grade; and that the psychology department "forced" her to transfer into the counseling department.

■ Dr. Fudin was plaintiff's professor. It was his job to critique her paper and give her a grade. Courts reviewing substantively a professor's academic judgment owe great deference to that judgment. *See University of Michigan v. Ewing,* 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985) (holding that "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment," courts may not overturn such decisions). Dr. Fudin may well have been less than the ideal mentor to plaintiff. Perhaps he was, as plaintiff says, someone everyone thought was "always trying to flunk you out, ... mean and nasty." But such faults, even if established, would not violate plaintiff's civil rights.

The court cannot say that because Dr. Fudin told plaintiff he would give her a poor grade and eventually gave her a "C+", he purposefully discriminated against her on the basis of her race. Plaintiff has offered no reasons other than her conclusory allegations to substantiate her claim that Dr. Fudin acted with a racially discriminatory intent.

Plaintiff's own testimony at her deposition and the letters she submitted during discovery do not support her claim that she was forced to transfer to another department. The record shows that plaintiff went to Dean Charlotte Elkind in the

spring of 1994 to explain her academic performance in the psychology department during the first semester. The Dean listened to her story and pointed out that if plaintiff stayed with the psychology department, Dr. Fudin would continue to be one of the professors evaluating her work. When plaintiff said she did not wish to take any more classes with him, Dean Elkind suggested she transfer to the counseling department. She assured plaintiff she would facilitate the transition. Plaintiff took the Dean's advice and began taking classes in the counseling department. Plaintiff's own recollection of these events does not support the claim that there was anything forced about the transfer.

Even if plaintiff had been "forced" to transfer into the counseling department, she does not establish that the University acted with discriminatory intent. There are other, race-neutral reasons why the department may have wanted plaintiff to transfer out of psychology. Indeed, the department might well have concluded that plaintiff's poor academic record during her first semester made her ill-qualified as a masters candidate in psychology.

Moreover, in order to support a claim of selective enforcement of a school's policy, a plaintiff must allege "purposeful and systematic discrimination by specifying instances in which [she was] singled out for unlawful oppression in contrast to others similarly situated." *Albert v. Carovano,* 851 F.2d 561, 573 (2d Cir.1988) (internal quotations omitted). Plaintiff does not refer to even one specific instance in which a similarly situated student was treated differently by the University.

It is assumed that Dr. Fudin did state that plaintiff was "in the wrong department" and warned that plaintiff should not "come in here [the psychology department] because if you do, you're going to lose your credits." But these statements are too vague to justify any plausible inference of a racially discriminatory intent. Moreover, plaintiff shows no reasonable nexus between Dr. Fudin's remarks in the hall-

way in July 1993 and his final decision to give her a grade of C+, the allegedly discriminatory act. *See, e.g., Ashton v. Pall Corp.,* 1999 WL 27481, at *8 (E.D.N.Y. Jan.15, 1999) (isolated comments cannot in and of themselves make out a case of employment discrimination); *O'Connor v. Viacom, Inc.,* 1996 WL 194299, at *5 (S.D.N.Y. Apr.23, 1996) ("Many courts have held that stray remarks in the workplace, by themselves, and without a demonstrated nexus to the complained of personnel actions, will not defeat the employer's summary judgment motion").

In addition plaintiff has not refuted defendant's argument that there is a legitimate, non-discriminatory explanation for Dr. Fudin's action, namely, that the grade was a fair academic assessment of the quality of plaintiff's paper.

A plaintiff cannot defeat a summary judgement motion by "the mere incantation of [discriminatory] intent or state of mind." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). Defendant's motion for summary judgment as to plaintiff's section 1981 claim will be granted.

IV

Plaintiff also makes a claim pursuant to section 601 of Title VI of the Civil Rights Act of 1964, which states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal Financial assistance." 42 U.S.C. § 2000d.

In *Guardians Ass'n v. Civil Serv. Com.,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), the Supreme Court held that this provision prohibits only intentional discrimination. *See id.* at 610–11, 103 S.Ct. at 3236–37 (opinion of Powell, J., in which Burger, C.J., and Rehnquist, J., joined); *New York Urban League, Inc. v.*

*New York,* 71 F.3d 1031, 1036 (2d Cir. 1995).

■ In addition, to succeed plaintiff must establish both that 1) the entity involved is engaging in racial or national origin discrimination and 2) the entity involved is receiving federal financial aid. *Scelsa v. City University of New York,* 806 F.Supp. 1126, 1139 (S.D.N.Y.1992).

■ As in her section 1981 claim, plaintiff has not established intentional discrimination based on race. Moreover, Title VI covers only those situations where "federal funding is given to a non-federal entity which, in turn, provides financial assistance to the ultimate beneficiary." *Sober-al–Perez v. Heckler,* 717 F.2d 36, 38 (2d Cir.1983). Plaintiff has not stated either in the complaint or elsewhere in the record that defendant is a recipient of federal financial aid.

## V

Defendant's motion for summary judgment as to the 1981 claim and the Title VI claim is granted. The court declines to exercise supplemental jurisdiction over the remaining state law claim.

So ordered.