**Matthew ROLPH, Plaintiff,**

v.

**HOBART AND WILLIAM SMITH COLLEGES, Defendant.**

**6:16–CV–06515 EAW**

United States District Court,
W.D. New York.

Signed 09/20/2017

---

Catherine H. Josh, Rochester, NY, Joshua A. Engel, pro hac vice, Engel and Martin, LLC, Mason, OH, for Plaintiff.

Angelo Anthony Stio, III, Pepper Hamilton LLP, Princeton, NJ, Hedya Aryani, pro hac vice, Michael E. Baughman, pro hac vice, Pepper Hamilton LLP, Philadelphia, PA, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, United States District Judge

## INTRODUCTION

Plaintiff Matthew Rolph ("Plaintiff"), a male and former student enrolled at Hobart and William Smith Colleges ("HWS" or "the Colleges"), was expelled from that school after having been found to have violated the school's Sexual Misconduct Policy by having non-consensual sex with a female classmate. Plaintiff brings suit against HWS, alleging that HWS's disciplinary process and expulsion of him violated federal and state law. He asserts the following claims: (1) a violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX"); (2) breach of contract; (3) promissory estoppel; (4) negligence; and (5) negligent infliction of emotional distress.

Presently before the Court is HWS's motion to dismiss Plaintiff's amended complaint for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is granted in part and denied in part. (Dkt. 15). Specifically, HWS's motion is denied with respect to Plaintiff's Title IX claim (Counts I and II) and granted with respect to Plaintiff's state law claims (Counts III through VI).

## FACTUAL BACKGROUND

The following facts are taken from Plaintiff's amended complaint and assumed to be true for purposes of this motion. *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016) ("On a motion under Rule 12(b)(6) to dismiss a complaint for failure to state a claim, the only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff's favor, in deciding whether the complaint alleges sufficient facts to survive.").

## I. National Controversy Concerning Sexual Assaults on College Campuses

In April 2011, the U.S. Department of Education's Office for Civil Rights ("OCR") issued a "Dear Colleague Letter" to colleges and universities in order to explain its interpretation of Title IX. (Dkt. 14 at ¶¶ 8–10; *see also* Dkt. 15–2). The Dear Colleague Letter instructed colleges and universities that compliance with Title IX requires transparent and prompt procedures to investigate and resolve complaints of sexual misconduct. (Dkt. 14 at ¶ 10(a)). The Dear Colleague Letter required colleges and universities to employ a "more likely than not" standard of proof in sexual misconduct cases; this standard was less exacting than the "clear and convincing" or "beyond a reasonable doubt" standards utilized at some colleges. (*Id.* at ¶ 10(b)). It also instructed universities that they should "minimize the burden on the complainant," "focus more on victim advocacy," and allow both parties the right to appeal a decision, which, according to Plaintiff, "amounts to double jeopardy for an accused student." (*Id.* at ¶ 10(c)–(e)). Many colleges changed their sexual misconduct policies and procedures after the Dear Colleague Letter was issued. (*Id.* at ¶ 10(f)).

In addition to the Dear Colleague Letter, the federal government pressured colleges to aggressively investigate sexual assaults through its own investigations of universities and potential lawsuits. (*Id.* at

¶ 11(a)). As of May 2014, the U.S. Department of Education was investigating 55 colleges—including HWS—for possible violations of the federal rules aimed at preventing sexual harassment. (*Id.* at ¶ 11(c)). Further, the federal government is investigating at least 129 colleges for possible Title IX violations. (*Id.* at ¶ 11(d)). Those schools that violate Title IX could lose federal funding. (*Id.* at ¶ 12(c)). HWS, like other colleges, fears the loss of federal funding and being investigated or sanctioned by the U.S. Department of Education or sued under Title IX by the U.S. Department of Justice ("DOJ"). (*Id.* at ¶ 12). According to Plaintiff, "[i]n response to pressure from OCR, DOJ, and the White House, educational institutions, like [HWS], are limiting procedural protections afforded to male students, like [Plaintiff], in sexual misconduct cases." (*Id.* at ¶ 13; *see also id.* at ¶ 12(a) ("The Federal government has created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt.")).

## II. Criticisms of HWS and its Adjudication of Sexual Misconduct Claims

In 2014, HWS attracted national attention for a sexual assault case in which a female student named Anna claimed that three members of the football team raped her in the fall of 2013. (*Id.* at ¶ 13). Following an investigation and adjudication at HWS, the football students were found not responsible. (*Id.*). On February 4, 2014, the *Huffington Post* published a blog post online entitled, "It's not Rape, if it's a Freshman: An Open Letter to Parents"; in it, a mother described her daughter's gang rape and sexual assault by members of the HWS football team and her disbelief that the football players were found not responsible by HWS despite evidence from a rape kit, medical evidence, and eyewitness accounts. (*Id.* at ¶ 13(a)).

Plaintiff alleges that, shortly after the *Huffington Post* blog post was published, the *New York Times* began investigating the same incident involving Anna and the football players. (*Id.* at ¶ 13(b)). On July 12, 2014, the *New York Times* published a front-page article that examined the incident involving Anna and the football players. (*Id.*).

According to Plaintiff, "[t]he Huffington Post and New York Times coverage brought national attention to [HWS] and increased the pressure on [HWS] to adjudicate harshly against the next male student that was alleged to have perpetrated a sexual assault." (*Id.* at ¶ 14). Plaintiff points to additional media coverage of the issue in *Slate* (*id.* at ¶ 14(b)) and the *Finger Lakes Times* (*id.* at ¶ 14(e)). The *Finger Lakes Times* reported in July 2014 that HWS had adjudicated seven sexual assault cases, resulting in the expulsion of four of those students, within the last two years; its coverage of the issue "touched off a flurry of online comments" criticizing HWS. (*Id.*).

Plaintiff also alleges that the Colleges' handling of sexual assault attracted the attention of students on campus and advocacy groups. (*Id.* at ¶ 14(c)–14(f)). On campus, a group of students, responding to the *New York Times* article, filed an online petition to HWS President, demanding that HWS "(a) make available the content of trainings for those involved in the reporting process, (b) conduct a nationwide search for a new, qualified Title IX Coordinator, [and] (c) appoint qualified individuals specifically designated to serve on the adjudication panel (Sexual Grievance Board)." (*Id.* at ¶ 14(c)). Plaintiff alleges that HWS is aware of the issue, as the HWS President was quoted as making the following statement to the *Finger Lakes*

*Times* in response to a "flurry of online comments":

> "Anything that would diminish [the] reputation is something we take very seriously ... I think we will and can move forward with the strength of our convictions here to do the right thing and engage in the social and community standards of civility and respect, that we have zero tolerance for violations of that community standard, for sexual misconduct. And I think we will be able to become, honestly, national leaders, because of this attention."

(*Id.* at ¶ 14(e)(ii)). Ultraviolet, an advocacy group focused on fighting sexism and expanding women's rights, has targeted prospective HWS students through an ad campaign that reads, "Applying to Hobart & William Smith? You should know about its rape problem." (*Id.* at ¶ 14(f)).

## III. HWS Policies

The Sexual Misconduct Policy sets forth the procedures for the investigation and adjudication of Title IX and sexual assault claims at HWS. (Dkt. 14 at ¶ 16). The Sexual Misconduct Policy that was in place during the events described in the complaint is set forth in HWS's 2013–2014 Student Handbook. (*Id.* at ¶ 15; Dkt. 1 at 48–60). It defines "sexual misconduct" to include "sexual harassment (including dating violence, domestic violence, and stalking), non-consensual sexual contact, non-consensual sexual intercourse, and sexual exploitation." (Dkt. 1 at 49). According to the Sexual Misconduct Policy, "[n]on-consensual sexual contact and non-consensual sexual intercourse include any form of sexual contact that occurs without effective consent" (*id.* at 51), which is understood as "words or actions that indicate a willingness to participate in mutually agreed-upon sexual activity" (*id.* at 52). Members of the HWS community who violate the policy may be subject to "sanctions ...

including, but not limited to: probation, required withdrawal, permanent separation, financial restitution, and/or other sanctions. ..." (*Id.* at 48).

The Sexual Misconduct Policy states that an individual "who feels he or she has been subjected to conduct in violation of this policy or who feels he or she has been accused of a violation of this policy should report the incident promptly" to certain designated members of the HWS community, including Campus Safety, the Title IX Coordinator, and the Associate Dean of Students. (*Id.* at 54). A complaint will be referred to the Colleges' Vice President for Human Resources (who is the Employee Sexual Grievance Officer) or the Associate Dean of Students (who is the Student Sexual Grievance Officer). (*Id.*). The Sexual Misconduct Policy provides that HWS has "the right to take action regarding any conduct prohibited by this policy at the appropriate time determined by the Colleges regardless of whether it violates the law and regardless of any action being pursued by the authorities." (*Id.*). The Sexual Misconduct Policy encourages good-faith reporting of complaints, stating that "[n]o action will be taken against an individual who makes a good faith allegation even if after investigating the allegation is not substantiated," but those who make a complaint based on knowingly-false allegations will be subject to discipline. (*Id.* at 55).

The Sexual Misconduct Policy defines the membership of the Sexual Grievance Board, which hears grievances or complaints related to sexual misconduct. (*Id.*). The Student Grievance Panel hears complaints brought against a student of HWS and consists of five members of the Sexual Grievance Board: the Employee Sexual Grievance Officer/Vice President for Human Resources (the Chair of the Panel), two students (a student from Hobart and a

student from William Smith) and two (2) employee members consisting of one faculty member and one staff member. (*Id.*). After a formal complaint is received, the Student Grievance Panel must convene as quickly as possible (within approximately five days). (*Id.* at 58).

The process for complaints involving students is as follows:

> For complaints involving students, the Panel will meet individually with the complainant, respondent(s), and any individuals the Panel considers likely to have relevant knowledge or information related to the complaint. Before the Panel commences its meetings, the complainant and respondent will also be permitted to provide a list of individuals with whom they believe the Panel should meet. The Panel will consider such requests and meet with such individuals at its discretion. The Panel may not compel any individual to comply with its request to meet.
>
> Legal counsel for students may not be present for any part of the Panel's meetings with the parties or witnesses. The Colleges will offer both the complainant and the respondent(s) the support of a trained process advisor/support person from the Colleges to explain the policy, procedures, rules and protocols and to assist them in the preparation of their complaints before a hearing is held. This individual shall not address the hearing panel or question witnesses.
>
> At the conclusion of the Panel's individual meetings with the parties and witnesses, and before its deliberations, the Panel will provide the complainant and respondent(s) an oral summary of the hearing, including a list of the individuals with whom the Panel has met and new or additional information that the Chair, in conjunction with the other panelists, has concluded is relevant to the Panel's deliberations. At this meeting, the complainant and respondent(s) will have an opportunity to identify any other individuals with whom he or she requests the Panel meet. Again, the Panel retains discretion to determine with whom it will meet to make its determination.

(*Id.* at 58–59). The Student Grievance Panel then makes a determination:

> Following the hearing, on the basis of its examination of the evidence and using the preponderance of the evidence standard (whether it is more likely than not that the actions in question are violations of this policy), the Panel will put its findings of fact in writing and will determine the appropriate disciplinary action and/or sanctions. Any disciplinary action or sanctions taken against an employee or a student will be put in writing and will be included in the relevant employee file or maintained in the student's file in the Office(s) of the Dean(s) of the involved student(s). The Vice President for Student Affairs or the Vice President for Human Resources will impose any sanctions determined by the Panel.

(*Id.* at 59). The decision of the Student Grievance Panel is final, unless an appeal is granted. (*Id.*). Both the respondent and the complainant may appeal the Student Grievance Panel's decision. (*Id.*). There are three grounds for appeal:

a. the original hearing was not conducted in conformity with prescribed procedures, and the deviation was material;

b. the decision did not follow from information presented to the Panel; or

c. the existence of new relevant facts, sufficient to alter the decision, not brought out in the original hearing, which could not have been known to or available to the appellant at the time of the original hearing.

(*Id.*). The Vice President for Student Affairs reviews appeals. (*Id.*).

Plaintiff alleges that "[t]he Colleges' Student Handbook is a contract between the students, including .[Plaintiff], and the College." (Dkt. 14 at ¶ 32).

## IV. Sexual Encounter between Plaintiff and Jane Roe

The sexual encounter between Plaintiff and Jane Roe that gave rise to the disciplinary proceedings at issue occurred between the evening of February 21, 2014, and the morning of February 22, 2014. (*Id.* at ¶¶ 2(a), 33). Before the encounter, Plaintiff and Jane Roe, although not officially dating, had been engaged in a sexual relationship for a number of months. (*Id.* at ¶ 34(a)). On February 21, 2014, Plaintiff went to Jane Roe's room; Jane Roe immediately began kissing him. (*Id.* at ¶ 34(b)). Plaintiff and Jane Roe engaged in consensual vaginal intercourse. (*Id.*). Jane Roe stopped the sexual activity in order to take a call on her cellphone. (*Id.* at ¶ 34(c)). After Jane Roe finished the phone call, she resumed consensual vaginal intercourse with Plaintiff. (*Id.* at ¶ 34(d)). A short time later, Jane Roe indicated that she had to use the bathroom and left the room; then, Jane Roe's friend, C.E., came into the room and asked Plaintiff to leave. (*Id.* at ¶ 34(d)–(e)). Plaintiff left; he later texted "go fuck yourself" to Jane Roe because he believed he was asked to leave because she had a relationship with another man, he was interested in a more significant relationship with her, and his feelings were hurt. (*Id.* at ¶ 34(e)). He did not have any other communication with Jane Roe after the incident. (*Id.* at ¶ 35).

## V. Complaint by Jane Roe and HWS Investigation

On or about February 25, 2014, Jane Roe reported a sexual assault to HWS and met with Jessica Ettell, Title IX coordinator for HWS, and Robert Flowers, Vice President for Student Affairs. (*Id.* at ¶ 36). The next day, Jane Roe went to the hospital, as an HWS professor insisted she do. (*Id.* at ¶ 37).

On February 28, 2014, Jane Roe gave a sworn statement in a Supporting Deposition for the City Court for the City of Geneva. (*Id.* at ¶ 38). She stated in the sworn statement that she had known Plaintiff since their sophomore year, and she texted Plaintiff to ask if she could meet with him. (*Id.* at ¶ 38(a)). She did not consider Plaintiff to be her boyfriend but had "'hooked up' with him about 10 or 15 times since the beginning of the school year." (*Id.* at ¶ 38(b)). She had consumed up to six drinks in a several-hour period. (*Id.* at ¶ 38(c)). She and Plaintiff went into a bedroom, where she removed her clothing with the intention of engaging in sexual activity. (*Id.* at ¶ 38(d)). The sexual activity was initially consensual, but after she received a phone call, Plaintiff "began to penetrate her anally with his penis and hand without her consent." (*Id.* at ¶ 38(e)). Jane Roe left and went to her friend's room; later, she received an angry text from Plaintiff, which was her last communication with him. (*Id.* at ¶ 38(f)).

Jane Roe sought a temporary order of protection against Plaintiff in Ontario County Family Court; Plaintiff consented to the order with no finding of fault. (*Id.* at ¶ 39). The Ontario County District Attorney's Office charged Plaintiff with a criminal sex act. (*Id.* at 40). A trial resulted in Plaintiff's acquittal. (*Id.*). Plaintiff's amended complaint contains no other allegations concerning the nature of the criminal charges against him, how the prosecution was initiated, or the events at trial. (*See id.*).

Plaintiff suspects that Jane Roe "had ulterior motives for making the allegations" against him: first, "for political purposes and to increase her standing within the community of women's studies majors" at HWS, and second, to avoid the jealousy of another male, who had confronted her about inviting Plaintiff to her apartment for sex. (*Id.* at ¶ 41).

HWS hired attorney Erin Beatty, Esq., of Harter Secrest Emery, LLP, to conduct an investigation on its behalf. (*Id.* at ¶ 42). Beatty claimed to be a "certified Title IX investigator," although Plaintiff contends that "there is no formal process for such a certification, and much of the training is done by an organization called the National Center for Higher Education Risk Management, which is a for-profit organization formed to support the marketing efforts of attorneys who operate in this field." (*Id.* at ¶ 42(a)). According to Plaintiff, "Beatty has a background in employment-related investigations, including matters of discrimination, harassment, and occupational safety and health," but not in conducting law enforcement investigations or investigations of sexual assault allegations. (*Id.* at ¶ 42(b)).

Beatty conducted an interview of Jane Roe that lasted for one hour and twenty minutes, during which Jane Roe stated the following. (*Id.* at ¶ 43(a)). Jane Roe texted Plaintiff and sought to have sex with him on the night of the incident, as she had done on previous occasions. (*Id.* at ¶ 43(d)). She also said she had consumed a "moderate amount of alcohol" but was too intoxicated to insist that Plaintiff use a condom; in what Plaintiff characterizes as a contradiction, Jane Roe stated that she was able to get out of bed to retrieve lubricant. (*Id.* at ¶ 43(e)). Jane Roe engaged in consensual vaginal intercourse with Plaintiff, but after she took a phone call from a person identified as J.C., Plaintiff anally penetrated Jane Roe without her consent. (*Id.* at ¶ 43(f)). After Jane Roe texted C.E. and left the room, C.E. came into the room and asked Plaintiff to leave. (*Id.* at ¶ 43(g)). Jane Roe spent that night in J.C.'s room. (*Id.* at ¶ 43(h)). In the morning, Jane Roe had breakfast with her parents, without mentioning any sexual assault. (*Id.*). The Vice President of Student Affairs called Jane Roe's parents to inform them of the allegations. (*Id.* at ¶ 43(i)). The day after the incident, Jane Roe told friends—A.V. and R.W.—about the sexual assault. (*Id.* at ¶ 43(j)). Jane Roe met with Ettell (HWS Title IX Coordinator) on February 25, 2014. (*Id.* at ¶ 43(k)). Jane Roe contacted a Dean of HWS to set up a meeting and indicated that it was an emergency because she had been sexually assaulted. (*Id.* at ¶ 43(1)). On February 26, 2015, Jane Roe met with professor H.D., who arranged for Jane Roe to go to the hospital. (*Id.* at ¶ 43(m)). Beatty did not, based on this interview, obtain Jane Roe's hospital records or cellphone records from her provider, take steps to preserve electronic records, or forensically analyze the phone. (*Id.* at ¶ 43(d), (m)). Nor did she interview the Vice President of Student Affairs, A.V., R.W., Ettell, the Dean, or professor H.D. (*Id.* at ¶ 43(i)–(m)). Beatty also did not ask "Jane Roe why she delayed in reporting" or "why Jane Roe declined a rape kit." (*Id.* at ¶ 43(n)).

Beatty interviewed J.C., during which J.C. stated as follows. (*Id.* at ¶ 44). On the night of the incident, J.C. spoke to Jane Roe on the phone, and Jane Roe told J.C. that she was having sex as they spoke. (*Id.* at ¶ 44(d)). Shortly after the incident, J.C. saw Jane Roe, who was visibly upset and stated that Plaintiff had "forced himself" onto her. (*Id.* at ¶ 44(e)). J.C. said that she was shocked by this and asked Jane Roe if she wanted a rape kit or to report the incident; eventually, Jane Roe answered

no. (*Id.*). Beatty did not review J.C.'s cellphone or cellphone records. (*Id.* at ¶ 44(f)).

Beatty interviewed C.E., a friend and roommate of Jane Roe. (*Id.* at ¶ 45(b)). C.E. stated as follows during the interview. Jane Roe "had not been drinking a lot" during the evening of February 21, 2014. (*Id.* at ¶ 45(c)). Initially, C.E. was upstairs while Jane Roe and Plaintiff were in Jane Roe's bedroom; C.E. came downstairs to retrieve her cellphone. (*Id.* at ¶ 45(d)). C.E. received a text message from Jane Roe as she was walking upstairs and then saw Jane Roe emerging from the bedroom. (*Id.*). C.E. observed that Jane Roe was upset and told her that "what happened was 'not OK....'" (*Id.* at ¶ 45(e)). C.E. stated that Jane Roe's other roommates received text messages from Jane Roe stating that HWS had called her parents, who were on their way to campus that night. (*Id.* at ¶ 45(f)). Beatty did not request or preserve C.E.'s cellphone evidence, or ask to speak with the other roommates. (*Id.* at ¶ 45(g)).

Beatty interviewed Plaintiff. (*Id.* at ¶ 46). In the interview, Plaintiff stated that, on the night of the incident, Jane Roe texted him multiple times and asked him to come to her apartment for sex. (*Id.* at ¶ 46(b)). Plaintiff stated that Jane Roe did not appear intoxicated, and he had not had much to drink that night. (*Id.* at ¶ 46(d)). Beatty did not inquire further about the amount of alcohol Plaintiff had consumed. (*Id.*). First, Plaintiff stated that "he did not consciously anally penetrate Jane Roe," but later, he "clarified his statement to indicate that he did not have anal sex with Jane Roe, and that he had never done so." (*Id.* at ¶ 46(e)). He stated that "he was not aware of the allegations about anal intercourse until after he read the court papers signed by Jane Roe." (*Id.*). Plaintiff believed Jane Roe received a text message rather than a phone call during inter-

course. (*Id.* at ¶ 46(f)). Beatty did not review or preserve Plaintiff's electronic evidence. (*Id.* at ¶ 46(g)).

Beatty interviewed M.K., a friend of Plaintiff. (*Id.* at ¶ 47(a)–(b)). M.K. told Beatty he received a text from Plaintiff at approximately 2:00 A.M. on February 22, 2014, asking M.K. if he could come over; M.K. allowed Plaintiff to sleep in his room that night. (*Id.* at ¶ 47(c)). Beatty's interview of M.K. focused on events following the incident and Plaintiff's emotional state; she did not request M.K.'s cellphone records. (*Id.* at ¶ 47(e)). Beatty also did not review cellphone or text messages from witnesses such as J.C. or C.E. (*Id.* at ¶ 48).

According to Plaintiff, Beatty's investigation "fell below the standard for a full, complete and competent investigation" not only because she failed to review or preserve electronic and other evidence as discussed, but she also: (1) did not record any interviews; (2) interviewed Jane Roe before reviewing any evidence or conducting an independent investigation; (3) did not probe Jane Roe's motive for delaying her disclosure of the alleged rape; (4) failed to obtain documentation supporting Jane Roe's claim of increased anxiety and medical issues after reporting the alleged rape; (5) did not conduct any follow-up interviews to resolve inconsistencies between witnesses' statements; and (6) neglected to interview other potential witnesses. (*Id.* at ¶ 50).

## VI. Disciplinary Hearing and Suspension of Plaintiff

On April 14, 2014, after receiving Beatty's report, HWS convened a Student Grievance Panel to adjudicate the claim that Plaintiff violated the Sexual Misconduct Policy by engaging in non-consensual sexual conduct with Jane Roe. (*Id.* at ¶ 51). The Student Grievance Panel members were the sexual grievance officer and vice

president of human resources for HWS, a member of the faculty from the Philosophy Department, and the Director of The College Store. (*Id.* at ¶ 51(a)). Plaintiff was denied counsel at the hearing; instead, he was allowed only an advisor, who was not permitted to speak to the Student Grievance Panel or question witnesses. (*Id.* at ¶ 51(c)). Jane Roe and Plaintiff each provided a statement to the Student Grievance Panel. (*Id.* at ¶ 51(d), (e)). Plaintiff was not permitted to question Jane Roe. (*Id.* at ¶ 51 (d)). The only witness against Plaintiff was Jane Roe. (*Id.* at ¶ 61(b)).

The Student Grievance Panel concluded that Plaintiff violated the Sexual Misconduct Policy by engaging in non-consensual sexual conduct with Jane Roe, and recommended that Plaintiff be expelled. (*Id.* at ¶ 52). On April 15, 2014—four weeks before graduation—Plaintiff was advised, in writing, that he was "permanently separated" from HWS; in other words, "he was expelled from school and barred from ever setting foot on campus." (*Id.* at ¶ 53). According to the letter, the Student Grievance Panel had concluded that Plaintiff had "more likely than not" committed the alleged offense, but the letter did not elaborate on the factual findings of the Student Grievance Panel. (*Id.* at ¶ 53(b)).

On April 16, 2014, Plaintiff notified HWS of his intent to appeal the Student Grievance Panel's decision. (*Id.* at ¶ 54). He was given until April 28, 2014, to prepare his letter of appeal. (*Id.* at ¶ 54(a)). Plaintiff did not have a transcript of the hearing to assist him in the preparation of his appeal; instead, he had to "sit in a public space in order to listen to a poor quality audio recording of the hearing," a setting which "prevented [him] from effectively consulting with counsel or an advisor" and that had "constant noise and frequent interruptions and distractions." (*Id.* at ¶ 54(b)).

Plaintiff submitted his appeal on April 28, 2014. (*Id.* at ¶ 55). The next day, he told the person tasked with hearing his appeal that he had learned of information that showed that Jane Roe had been untruthful in some statements she made before the Student Grievance Panel. (*Id.* at ¶ 56). On May 1, 2014, Plaintiff's appeal was denied.

Plaintiff contends, upon information and belief, that internal emails at HWS reveal that HWS had predetermined that he was guilty before the hearing. (*Id.* at ¶ 58). Plaintiff further contends that HWS had taken this position because it was "heavily invested in protecting female accusers," "to avoid further scrutiny from OCR," and because it was "afraid of a further investigation from OCR and/or a Title IX lawsuit from DOJ." (*Id.* at ¶ 59). According to Plaintiff, HWS punished him to make an example of him and to "demonstrate that, contrary to the well-known incident of 'Anna' that was being investigated for an upcoming article in the New York Times, that [HWS is] tough on men who 'victimize' female students." (*Id.* at ¶ 60).

Plaintiff alleges that he "has been deeply and irreparably harmed by [HWS's] actions and continued actions." (*Id.* at ¶ 62). In particular, the expulsion prevented him from receiving his college degree at his chosen school, and will "follow him throughout his life" and cause him difficulty in obtaining a college degree from another institution. (*Id.*). Further, the expulsion has damaged his academic and professional reputations and caused him "substantial emotional distress." (*Id.*).

## PROCEDURAL HISTORY

Plaintiff filed his suit on July 26, 2016, and an amended complaint on September 6, 2016, which became the operative pleading in this case. (Dkt. 1; Dkt. 14). Plaintiff's amended complaint sets forth six

causes of action, labeled as separate "counts": (1) a Title IX claim seeking a declaratory judgment; (2) a claim for damages under Title IX; (3) breach of contract; (4) promissory estoppel; (5) negligence; and (6) negligent infliction of emotional distress. (Dkt. 14 at ¶¶ 63–100). As to Count 1, Plaintiff seeks a declaratory judgment that the Colleges have violated his rights under Title IX. As for the remaining counts, he seeks an award of damages. He also seeks an injunction restoring him as a student and prohibiting any further disciplinary proceedings in a manner that violates the contract between the parties and his rights under Title IX. (*Id.* at 40).

HWS moved to dismiss the amended complaint on September 26, 2016. (Dkt. 15). Plaintiff filed a response in opposition to the motion on October 17, 2016. (Dkt. 17). HWS filed a reply in support of its motion on October 24, 2016. (Dkt. 18). Plaintiff filed a notice of supplemental authority on December 5, 2016. (Dkt. 20). Oral argument was held before the undersigned on December 6, 2016, at which time the Court reserved decision. (Dkt. 21).

## DISCUSSION

### I. Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Generally, the Court must accept as true all of the allegations contained in the complaint. *See id.* That rule does not apply to legal conclusions, however: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . are not entitled to the assumption of truth." *Id.*; *see also Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (stating that a court is "not bound to accept as true a legal conclusion couched as a factual allegation").

The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679, 129 S.Ct. 1937. Plausibility is "a standard lower than probability." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012). "[A] given set of actions may well be subject to diverging interpretations, each of which is plausible," and "[t]he choice between or among plausible inferences or scenarios is one for the factfinder." *Id.* A court "may not properly dismiss a complaint that states a plausible version of the events merely because the court finds that a different version is more plausible." *Id.* at 185.

### II. Title IX

Plaintiff's first and second causes of action allege gender-based discrimination in violation of Title IX; Count I seeks a declaratory judgment, while Count II seeks damages and attorney's fees. (Dkt. at ¶¶ 63–78). Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation

in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 .U.S.C. § 1681(a). Title IX, "which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities." *Columbia Univ.*, 831 F.3d at 53. "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar[ ] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'" *Id.* (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).

 Cases attacking university disciplinary proceedings on the ground of gender bias "fall generally within two categories." *Yusuf*, 35 F.3d at 715. The first category is an "erroneous outcome" theory, under which "the claim is that the plaintiff was innocent and wrongly found to have committed an offense." *Id.* The second category is a "selective enforcement" theory. *Id.* The claim "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.* Plaintiffs "may plead in the alternative that they are in both categories," but regardless of the category, "wholly conclusory allegations" are insufficient to survive a Rule 12(b)(6) challenge. *Id.*

## A. Plaintiff's Title IX Claim

Plaintiff alleges that he was subject to gender-based discrimination in violation of Title IX. In his briefing, Plaintiff contends that he asserts both an erroneous outcome claim and a selective enforcement claim against HWS (Dkt. 17 at 7), although HWS views the amended complaint as as-

serting only an erroneous outcome claim (Dkt. 15 at 19). The Court considers each type of claim in turn, and, for the reasons discussed below, finds that Plaintiff's amended complaint pleads specific facts that support a minimal plausible inference of gender discrimination.

### 1. Erroneous Outcome

 As noted above, a plaintiff bringing an erroneous outcome challenge must allege (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding"; and (2) "a causal connection between the flawed outcome and gender bias." *Yusuf*, 35 F.3d at 715. "Such allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*

HWS argues that "Plaintiff identifies no overt evidence of gender discrimination in the Amended Complaint." (Dkt. 15 at 19). HWS argues that Plaintiff's allegations fall short of those at issue in *Columbia University*, contending that he "fails to point to 'criticisms circulating in the student body and public press' about HWS' handling of sexual assault that existed at the time of his proceedings which could have influenced those responsible for those proceedings." (*Id.* at 20). Plaintiff counters that *Columbia University* is "precisely akin" to his case, and that he has pleaded specific facts to support a plausible inference of gender discrimination, such as media criticism of HWS' handling of sexual assault cases, federal government pressure to aggressively pursue sexual assault cases, and a flawed process during his disciplinary proceedings. (Dkt. 17 at 14–16).

In *Columbia University*, the Second Circuit addressed the standard for judging

the sufficiency of a complaint alleging discrimination under Title IX. 831 F.3d at 53–56. Prior to *Columbia University*, the Second Circuit issued *Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015), which addressed the standard for pleading employment discrimination claims that are subject to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[1] Under that framework, if a plaintiff has established a *prima facie* case, then that showing will give rise to a temporary presumption of discriminatory motivation, which then shifts the burden to the employer and requires the employer to articulate a justification for its adverse employment action. *Littlejohn*, 795 F.3d at 307. *Littlejohn* held that the plausibility standard of *Iqbal* applies to employment discrimination complaints; therefore, at the pleading stage, "[t]he facts required ... to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation." *Id.* at 311.

 In *Columbia University*, the Second Circuit reiterated that Title VII employment discrimination cases provide

the proper framework for analyzing Title IX claims. 831 F.3d at 55–56. Accordingly, "the temporary presumption afforded to plaintiffs in employment discrimination cases under Title VII applies to sex discrimination plaintiffs under Title IX as well." *Id.* at 56; *see also Yusuf*, 35 F.3d at 714–15 ("Allegations of a causal connection in the case of university disciplinary cases can be of the kind that are found in the familiar setting of Title VII cases."). Accordingly,

> a complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a minimal plausible inference of such discrimination.

*Columbia Univ.*, 831 F.3d at 55–56. Further, "the inference of discriminatory intent supported by the pleaded facts [need not] be *the most plausible* explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible." *Id.* at 57.

Applying this pleading standard in *Columbia University*, the Second Circuit vacated a district court's dismissal of a complaint that alleged that Columbia Uni-

---

**1.** The *Littlejohn* court explained the burden-shifting framework of *McDonnell Douglas* as follows:

> If the plaintiff can show (1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation, such a showing will raise a temporary "presumption" of discriminatory motivation, shifting the burden of production to the employer and requiring the employer to come forward with its justification for the adverse employment ac-

tion against the plaintiff. However, once the employer presents evidence of its justification for the adverse action joining issue on plaintiffs claim of discriminatory motivation, the presumption "drops out of the picture" and the *McDonnell Douglas* framework "is no longer relevant." At this point, in the second phase of the case, the plaintiff must demonstrate that the proffered reason was not the true reason (or in any event not the sole reason) for the employment decision, which merges with the plaintiff's ultimate burden of showing that the defendant intentionally discriminated against her.

*Littlejohn*, 795 F.3d at 307–08 (internal citations omitted).

versity had violated Title IX by acting with gender bias in investigating and suspending a male student for an alleged sexual assault. *Id.* at 48. The Second Circuit reasoned that the complaint pleaded "sufficient specific facts giving at least the necessary minimal support to a plausible inference of sex discrimination to survive a Rule 12(b)(6) motion to dismiss...." *Id.* at 56. The allegations that supported that inference included the following: (1) the investigator and hearing panel did not seek out all witnesses that the plaintiff had identified as sources of information favorable to him; (2) the investigator and panel failed to comply with Columbia University's procedures designed to protect accused students; (3) the investigator, the panel, and the reviewing Dean reached conclusions that were erroneous and contrary to the weight of the evidence; (4) during the period before the disciplinary hearing, both the student body and public media heavily criticized Columbia University and accused it of not taking seriously complaints of female students alleging sexual assault by male students; and (5) Columbia University was aware of and sensitive to those criticisms. *Id.* at 56–57. Although the allegations concerning the procedural defects alone supported an inference of bias, the allegations concerning the public criticism gave "ample plausible support to a bias with respect to sex." *Id.* at 57. The Second Circuit reasoned that, "[a]gainst this factual background, it is entirely plausible that [Columbia] University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault." *Id.*

■ Here, Plaintiff has adequately alleged facts that plausibly support at least a minimal inference of gender bias on the part of HWS. The allegations which support that inference include the following. Plaintiff alleges that, before his disciplinary hearing, HWS was criticized in the media for failing to take seriously female students' complaints of sexual assault by male students. (Dkt. 14 at 69). In support, Plaintiff points to the *Huffington Post* blog post concerning the "Anna" incident published in February 2014, months before his expulsion. (*Id.* at ¶ 13(a)). He also alleges that the *New York Times* began investigating the "Anna" incident shortly after the *Huffington Post* blog post was published. (*Id.* at ¶ 13(b)–(c)). True, as HWS points out, some of Plaintiff's allegations describe news coverage or public responses that occurred after Plaintiff's appeal was denied on May 1, 2014. (*See id.* at ¶¶ 13(b) (*New York Times* article published in July 2014), 14(c) (student petition to HWS arising out of *New York Times* article), 14(e) (*Finger Lakes Times* article published in July 2014)). According to HWS, this distinguishes Plaintiff's case from *Columbia University*. (Dkt. 15 at 20–21); *see also Doe v. Baum*, 227 F.Supp.3d 784, 818 (E.D. Mich. 2017) ("News accounts more than two years removed from the events and the panel decision do not supply any plausible support for vague allegations that the panel members were goaded by public pressure to 'make an example' of the plaintiff merely because he was a male student charged with sexual assault."). However, Plaintiff's allegations concerning the *Huffington Post* blog post and the commencement of the *New York Times* investigation in February 2014—months before his expulsion—support Plaintiff's allegation that some public pressure already existed when HWS took action against him.

Plaintiff also alleges that HWS faced pressure from the federal government to take a hard stance on sexual assault on

campus. He focuses on OCR's "Dear Colleague Letter" from April 2011, which included guidance on compliance with Title IX and best practices in sexual assault cases. (Dkt. 14 at ¶¶ 8–10). He contends that the Dear Colleague Letter, as well as OCR's threat to withhold federal funding from schools not in compliance and the U.S. Department of Education's disclosure in May 2014 that HWS was one of 55 universities under investigation for possibly violating rules aimed at preventing sexual harassment, conspired to induce HWS to "limit procedural protections afforded to male students," such as Plaintiff, and avoid further scrutiny. (*Id.* at ¶ 13).

Plaintiff further alleges that his disciplinary proceedings put him at a disadvantage as compared to Jane Roe. For example, Plaintiff points to the fact that, during the proceeding, he was not allowed to be represented by counsel and to cross-examine Jane Roe, and "[t]here was no physical evidence or witness to support the allegations that [he] was guilty." (Dkt. 14 at ¶ 61(b)). As HWS points out, some of these procedures were applied to Jane Roe; she, too, for example, was not permitted to have counsel. (Dkt. 15 at 23–24). HWS contends that it complied with its own procedures with respect to both Plaintiff and Jane Roe, and as a result, this negates any inference of gender bias. But Plaintiff alleges additional facts that support an inference of bias. According to Plaintiff, Beatty's investigation was insufficient because she, *inter alia*, failed to review or preserve electronic evidence or conduct any follow-up interviews to resolve inconsistencies between witnesses' statements. (Dkt. 14 at ¶ 50). He alleges that HWS helped Jane Roe prepare her case. (*Id.* at ¶ 69(f)). He also alleges that the panel questioned him extensively about whether he was intoxicated and whether he perceived Jane Roe as intoxicated, but failed to question her about whether he appeared

intoxicated; this, according to Plaintiff, "is consistent with a view of men as predators and women as 'guardians of virtue.'" (*Id.* at ¶ 69(g)). Although such defects, standing alone, may not necessarily support an inference of bias on account of gender, *see Columbia University*, 831 F.3d at 57, Plaintiff, having coupled the allegations with the allegations of public pressure, has met his low burden at the pleading stage.

HWS argues that *Columbia University* is not only distinguishable from Plaintiff's case, but also that it was wrongly decided by the Second Circuit. (Dkt. 15 at 20 n.5). HWS also notes that a petition for rehearing *en banc* was pending when the motion to dismiss was filed. (*Id.*). The Court declines to depart from *Columbia University* for two reasons. First, the petition for rehearing has since been denied. *See* 2d Cir. 15–1536, Dkt. 132. Thus, *Columbia University* remains binding precedent on this Court. Second, *Columbia University* is not the outlier that HWS suggests. As HWS points out, at least one court has declined to follow *Columbia University*. *See Austin v. Univ. of Or.*, 205 F.Supp.3d 1214, 1226 (D. Or. 2016). In that case, the district court first distinguished *Columbia University* on its facts, observing that the plaintiffs had not made "similar allegations of an atmosphere of scrutiny," and then criticized the pleading standard enunciated in *Columbia University*, stating that "to accept the Second Circuit's pleading standard would put universities in a double bind. Either they come under public fire for not responding to allegations of sexual assault aggressively enough or they open themselves to Title IX claims simply by enforcing rules against alleged perpetrators." *Id.* at 1226–27. However, "several courts cite *Columbia* as a correct statement of the law and either rely on it in finding similar allegations plausible ..., or distinguish it with good reason on the

facts."[2] *Neal v. Colorado State Univ.-Pueblo*, No. 16-CV-873-RM-CBS, 2017 WL 633045, at *15 (D. Colo. Feb. 16, 2017); *see, e.g., Doe v. Cummins*, 662 Fed.Appx. 437, 453 (6th Cir. 2016) (distinguishing *Columbia University* on the basis that the "[a]ppellants fail to allege similar supporting facts"); *Doe v. Univ. of St. Thomas*, 240 F.Supp.3d 984, 992–93 (D. Minn. 2017) (distinguishing *Columbia University* on the facts); *Baum*, 227 F.Supp.3d at 818 ("The Second Circuit provided a framework for . . . a claim [for gender bias that led to an erroneous outcome] claim in . . . *Columbia University* . . . but that case is readily distinguishable on its facts. . . .").

HWS also argues that any inference of gender discrimination is negated by the fact that Plaintiff was criminally charged with a sex crime, and Plaintiff does not allege that the District Attorney's Office was motivated by gender bias when it concluded that there was "reasonable cause" to prosecute Plaintiff. (Dkt. 15 at 21). According to HWS, "[t]hat an independent third party reached the same conclusion as HWS negates any inference—minimal or not—that HWS reached an erroneous outcome in the case. . . ." (*Id.*). The Court is not persuaded by this argument. Even if the prosecutors acted without gender bias in prosecuting Plaintiff, it does not necessarily follow that HWS *did not* act with gender bias in its actions against Plaintiff. Further, the complaint contains no facts regarding the information known to the state prosecutors, although their actions were apparently taken after HWS engaged in its actions—that were, according to Plaintiff, motivated by gender bias. The extent to which HWS's alleged gender-biased actions influenced the state prosecutors' conduct is not clear at this stage of the proceedings. Additionally, Plaintiff alleges that, after trial, he was acquitted of the criminal sex act with which he was charged (Dkt. 14 at ¶ 40); that result is consistent with his erroneous outcome claim. As the Second Circuit instructed, "the inference of discriminatory intent supported by the pleaded facts [need not] be *the most plausible* explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible." *Columbia Univ.*, 831 F.3d at 57. Here, it is at least plausible that gender bias motivated HWS in its actions against Plaintiff.

### 2. Selective Enforcement

As noted above, to state a selective enforcement claim, a plaintiff must plausibly allege that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate

**2.** Plaintiff cites to *Collick v. William Paterson University*, Civ. No. 16-471 (KM) (JBC), 2016 WL 6824374 (D.N.J. Nov. 17, 2016), as an additional example of a case in which a district court relied on *Columbia University* to deny a motion to dismiss a Title IX claim brought by a male student accused of sexual assault. (Dkt. 20). However, the *Collick* court noted that "[t]he Third Circuit has yet to directly address the application of *McDonnell Douglas* to the pleading burden for Title IX claims in the context of a motion to dismiss," and suggested that "[t]he issue is one that should be addressed, in a proper case, by the Third Circuit." *Collick*, 2016 WL 6824374, at *10. The court then concluded that the pleading standard did not matter because, in that case, "[w]hether under the off-the-rack *Iqbal* standard or a tailored *McDonnell Douglas* standard, [the court] would find that gender-based discrimination in Defendants' treatment of [the male students] is adequately pled." *Id.* Thus, contrary to Plaintiff's characterization, *Collick* is not an explicit endorsement of *Columbia University's* pleading standard, but it does support the Court's conclusion that Plaintiff has adequately pleaded his claims. *See id.* at *10–12 (finding sufficient allegations of inadequate investigation and deficiencies in the hearing, as well as procedural deficiencies and pressure from the public's and policymakers' attention to the issue of campus sexual assault).

the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715. In *Yusuf*, a Title IX selective enforcement claim was dismissed where there were no allegations that the school treated similarly situated members of the opposite sex— that is, members of the opposite sex facing comparable disciplinary charges—differently. *Id.* at 716 (affirming dismissal of a Title IX selective enforcement claim where the plaintiff failed to allege that any woman was treated differently and that the allegedly disparate treatment of another accused student was based on similar disciplinary charges). In this case, the complaint fails to include any allegations that female students were treated differently under HWS's disciplinary process. Indeed, in the complaint, Plaintiff alleges that "women rarely, if ever, are accused of sexual harassment by the Colleges" (Dkt. 14 at ¶ 68(b)), which suggests that a similarly-situated comparator may not exist. Accordingly, the selective enforcement theory is inapplicable to this case.

### III. Whether Plaintiff's State-Law Claims are Time Barred

HWS argues that Plaintiff's state law claims, to the extent that they challenge his expulsion, should have been brought in an Article 78 proceeding within four months after the expulsion became final, and are untimely as a result. (Dkt. 15 at 25–26). The Court is not persuaded by this argument.

 Article 78 sets forth procedures for parties seeking "[r]elief previously obtained by writs of certiorari to review, mandamus or prohibition." CPLR 7801. "Proceedings under Article 78 are typically the avenue for parties challenging administrative actions by governmental agencies or by the decisionmaking bodies of private entities." *Gally v. Columbia Univ.*, 22 F.Supp.2d 199, 205 (S.D.N.Y. 1998) (cita-

tion omitted); *see Gertler v. Goodgold*, 107 A.D.2d 481, 487, 487 N.Y.S.2d 565 (1st Dep't 1985) ("[I]nternal administrative and academic determinations . . . are redressable, if at all, in an article 78 proceeding, not a plenary action.").

The nature of the relief sought is key to determining whether Article 78 applies. In *Gally*, a former dental student brought a lawsuit against a dental school, asserting breach of contract and constructive discharge from the dental school. 22 F.Supp.2d at 204. The district court rejected the argument that the dental student's suit had to be brought in an Article 78 proceeding because the dental student sought "neither to compel nor to prohibit any action by defendants," and instead sought "monetary damages for injuries allegedly suffered as a result of defendants' breach of its contractual obligations." *Id.* at 205. Similarly, in *Papaspiridakos v. Education Affiliates, Inc.*, the district court concluded that a nursing student's claims did not need to be brought in an Article 78 proceeding because the plaintiff did "not seek to compel any action by Defendant, and instead seeks monetary damages for breach of contract and deceptive business practices." No. 10 CV 5628(RJD)(JO), 2013 WL 4899136, at *2 (E.D.N.Y. Sept. 11, 2013), *aff'd*, 580 Fed.Appx. 17 (2d Cir. 2014).

According to the amended complaint, Plaintiff seeks both damages and injunctive relief, requesting:

- On Count I, a Declaratory Judgment that [HWS] has violated Rolph's rights under Title IX;

- On Counts II–VI, Judgment in favor of Rolph awarding damages in an amount to be determined at trial;

- *An Injunction restoring Rolph as a student and prohibiting further disciplinary proceedings in a manner*

*that violates the contract between the parties and Rolph's rights under Title IX*; and

- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees, as provided by 42 U.S.C. § 1988 and other applicable statutes, laws, and rules.

(Dkt. 14 at 40 (emphasis added)). The amended complaint does not specify whether Plaintiff seeks injunctive relief as to all or only some of his claims.

HWS argues that Plaintiff's case is distinguishable from *Gally* and *Papaspiridakos* because in those cases the plaintiffs sought only damages, whereas Plaintiff seeks an injunction in addition to damages. (Dkt. 18 at 10–11). Plaintiff counters that injunctive relief is available through his Title IX claim. (Dkt. 17 at 20 n.12). Again, Plaintiff's amended complaint does not specify the claims through which the injunctive relief is sought, but he is correct that in a Title IX suit, "both injunctive relief and damages are available." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009). Further, each of his state law claims describes the nature of the damages he sustained. (Dkt. 14 at ¶¶ 85 (breach of contract), 90 (promissory estoppel), 96 (negligence), 100 (negligent infliction of emotional distress)). Reading Plaintiff's amended complaint in the light most favorable to him, and in light of the fact that injunctive relief is available through Plaintiff's Title IX claim, the Court construes Plaintiff's state law claims as seeking only monetary damages and, thus, rejects HWS's argument that the state law claims should have been brought in an Article 78 proceeding.

## IV. Breach of Contract

Plaintiff's third cause of action is for breach of contract. (Dkt. 14 at ¶¶ 79–85).

HWS argues that Plaintiff's breach of contract claim must be dismissed because he fails to identify a specific, enforceable provision of the implied contract that HWS allegedly violated, and fails to identify any substantial deviation from HWS's policies and procedures. The Court agrees.

In certain situations, a student may sue his college for a breach of an implied contract. *Routh v. Univ. of Rochester*, 981 F.Supp.2d 184, 207 (W.D.N.Y. 2013).

> Under New York law, an implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree. The terms of the implied contract are contained in the university's bulletins, circulars and regulations made available to the student. Implicit in the contract is the requirement that the institution act in good faith in its dealing with its students. At the same time, the student must fulfill his end of the bargain by satisfying the university's academic requirements and complying with its procedures.

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (citations and internal quotation marks omitted). "Significantly, though, 'when a disciplinary dispute arises between the student and the institution, judicial review of the institution's actions is limited to whether the institution acted arbitrarily or whether it substantially complied with its own rules and regulations.'" *Routh*, 981 F.Supp.2d at 208 (quoting *Jones v. Trs. of Union Coll.*, 92 A.D.3d 997, 998–99, 937 N.Y.S.2d 475 (3d Dep't 2012)).

Further, a student asserting a breach of contract claim must identify the

specific terms of the implied contract that were allegedly violated by the college (such as an internal rule, regulation, or code), and failure to do so is fatal to the claim. *Id.* (citing *Jones,* 92 A.D.3d at 999, 937 N.Y.S.2d 475). "Not all terms in a student handbook are enforceable contractual obligations, however, and courts will only enforce terms that are 'specific and concrete.'" *Knelman v. Middlebury Coll.,* 898 F.Supp.2d 697, 709 (D. Vt. 2012) (citation omitted), *aff'd,* 570 Fed.Appx. 66 (2d Cir. 2014). "[G]eneral statements of policy" or "broad pronouncements of [a] University's compliance with existing anti-discrimination laws, promising equitable treatment of all students" cannot provide the basis for a breach of contract claim. *Ward v. N.Y. Univ.,* No. 99 CIV. 8733(RCC), 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000); *see also Faiaz v. Colgate Univ.,* 64 F.Supp.3d 336, 359–60 (N.D.N.Y. 2014) (finding that an alleged violation of the requirement that "standards of consistency and equity [in disciplinary proceedings] are maintained" could not form basis of breach for contract claim); *Knelman,* 898 F.Supp.2d at 709 (finding that "[l]anguage in a college handbook or other official statement that is merely aspirational in nature or that articulates a general statement of a school's 'ideals,' 'goals,' or 'mission,' is not enforceable," including general promises about ethical standards); *Gally,* 22 F.Supp.2d at 208 (finding that a provision of code of conduct that provides "[a]ll students should receive fair and equal treatment" was "merely a general statement of adherence ... to existing anti-discrimination laws" and did "not create a separate and independent contractual obligation"). Moreover, "a student cannot maintain a breach of contract claim against a university based solely on the implied covenant of 'good faith.'" *Evans v. Columbia Univ.,* No. 14-CV-2658 (NSR), 2015

WL 1730097, at *4 (S.D.N.Y. Apr. 13, 2015).

Plaintiff alleges that he had an implied contract with HWS, the terms of which are found "in various College policies and procedures, including those set forth in the Student Handbook." (Dkt. 14 at ¶ 81). He identifies the following alleged breaches of the Student Handbook by HWS; (1) it "breached the implied obligation to perform a threshold evaluation of the allegations before starting an investigation"; (2) it "breached the explicit and implied obligation to conduct a full and fair investigation of the claims against [Plaintiff]" by employing Beatty, who did not begin investigating until weeks after the complaint was filed and who "had no real-world experience in, or training about, investigations into allegations [of] sexual assault"; (3) it breached the "explicit and implied obligation to conduct a full and fair hearing before an unbiased hearing panel" by not allowing Plaintiff to confront Jane Roe; (4) it breached "express and implied obligations when it did not permit [Plaintiff] to be represented by counsel"; and (5) it breached "an express and implied obligations when it found [Plaintiff] [r]esponsible without sufficient evidence." (Dkt. 14 at ¶ 84(a)–(f)). Plaintiff also contends that HWS violated the duty of good faith and fair dealing. (*Id.* at ¶¶ 82, 84). According to Plaintiff, "the key allegation" (Dkt. 17 at 22) that establishes the basis for the breaches is as follows:

> The contract between Rolph and the Colleges contains an implied covenant of good faith and fair dealing. This implied covenant prohibits the Colleges from doing anything which will have the effect of destroying or injuring the right of Rolph to receive the fruits of the contract. The contract between Rolph and the College, as a result, impliedly included the requirement that the Colleges

provide Rolph with an investigatory and adjudicatory process that was "essentially fair."

(Dkt. 14 at ¶ 82).

Plaintiff lists various alleged breaches of the Student Handbook (Dkt. 14 at ¶ 84(a)–(f)), but he fails to identify any specific terms of the implied contract that were violated. *See Prasad v. Cornell Univ.*, Civil Action No. 5:15-cv-322, 2016 WL 3212079, at *20 (N.D.N.Y. Feb. 24, 2016) ("The Amended Complaint *appears* to indicate that Cornell breached a general agreement to provide Plaintiff an impartial and timely disciplinary hearing, but it is not the Court's function to speculate what Plaintiff intended. Because Plaintiff does not specify what agreement Defendant violated, and how it was violated, Plaintiff's breach of contract claim must be dismissed."). Indeed, a review of the Student Handbook does not reveal that it contains the provisions that Plaintiff alleges were breached. The Student Handbook has no specific provision, for example, that obligates HWS to conduct a "threshold evaluation of the allegations before starting an investigation" (Dkt. 14 at ¶ 84(a)) as Plaintiff alleges; rather, the Sexual Misconduct Policy states that "[u]pon receipt of the complaint ... the SSGO ... will conduct a fact finding that may include an investigation. ..." (Dkt. 1 at 58). Nor does the Sexual Misconduct Policy contain a specific promise about the timeline of the investigation or qualifications of the investigator. (*See id.*). It also does not allow either party to have counsel. (*Id.*). Absent any specific provision that was violated, Plaintiff's claims for breach of contract appear to arise out of various aspirational statements in the Stu-

dent Handbook. (*See id.* at ¶ 15(a) (citing provision stating that "the Colleges is 'committed to creating and maintaining an academic and working environment that respects the different voices and experiences of its members and that nurtures the trust of its academic mission' "), 15(b) (citing provision stating that the Sexual Misconduct Policy is "intended to reflect the interests of the [Colleges] community and, to the extent applicable, federal and state laws")). As discussed, aspirational statements like those do not provide a valid basis for a breach of contract claim.

Further, even if Plaintiff had identified a specific provision that was violated, the Court finds that Plaintiff has not alleged that HWS "acted arbitrarily" or failed to "substantially compl[y] with its own rules and regulations." *Routh*, 981 F.Supp.2d at 208.[3] For example, the Sexual Misconduct Policy does not allow any party to have counsel in the disciplinary proceedings, and so the fact that Plaintiff did not have counsel is not a deviation from its policy. (Dkt. 1 at 58 ("Legal counsel for students may not be present for any part of the Panel's meetings with the parties or witnesses.")).

Finally, the allegation of a breach of the implied covenant of good faith and fair dealing cannot support Plaintiff's breach of contract claim. *See Evans*, 2015 WL 1730097, at *4. For these reasons, Plaintiff's breach of contract claim is dismissed.

## V. Promissory Estoppel

Plaintiff's fourth cause of action is for promissory estoppel. (Dkt. 14 at ¶¶ 86–90). HWS moves to dismiss Plaintiff's promis-

---

3. There is a distinction between Plaintiff's allegations that HWS breached some provision of the Student Handbook (set forth in support of his breach of contract claim) and his allegations that the Sexual Misconduct Policy establishes a flawed proceeding that is biased against male students (set forth in support of his Title IX claims). In other words, assuming that Plaintiff's disciplinary proceedings were infected by gender bias, it does not necessarily follow that HWS breached a provision of the Student Handbook.

sory estoppel claim because the claim is based on promises contained in the Student Handbook, and Plaintiff fails to identify a specific promise. (Dkt. 15 at 30–31). The Court agrees and dismisses the promissory estoppel claim.

 "In New York, promissory estoppel has three elements: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of the reliance." *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (internal quotation marks omitted). "A plaintiff may utilize the doctrine of promissory estoppel in two situations: (1) to enforce a 'promise in the absence of bargained for consideration'; and (2) 'to provide relief to a party where the contract is rendered unenforceable by operation of the Statute of Frauds.'" *Kant v. Columbia Univ.*, No. 08 Civ. 7476(PGG), 2010 WL 807442, at *4 (S.D.N.Y. Mar. 9, 2010) (quoting *Merex A.G. v. Fairchild Weston Sys.*, 29 F.3d 821, 824 (2d Cir. 1994)). "Where an enforceable contract exists, the doctrine of promissory estoppel is inapplicable and a plaintiff cannot recover under this theory." *Id.*

 In his complaint, Plaintiff alleges that "[t]he Student Handbook and other official Colleges publications constitute promises and representations that intended to induce reliance on the part of [Plaintiff]." (Dkt. 14 at ¶ 87). He further alleges that HWS made "express and implied promises, including the guarantees of fundamental fairness, and the implied covenant of good faith and fair dealing." (*Id.*). In opposition to the motion to dismiss, Plaintiff explains that his promissory estoppel claim is based on explicit promises within the Student Handbook, such as its statement that the chair of a hearing panel "is responsible for conducting a fair, order-

ly, and expeditious hearing." (Dkt. 17 at 24–25).

Plaintiff's promissory estoppel claim fails because there is an enforceable contract between him and HWS, the terms of which, according to Plaintiff, are also supplied by the Student Handbook. *See Papelino*, 633 F.3d at 93 ("Under New York law, an implied contract is formed when a university accepts a student for enrollment.... The terms of the implied contract are contained in the university's bulletins, circulars and regulations made available to the student."). That Plaintiff has failed to sufficiently allege a breach of any contractual provision does not give rise to a promissory estoppel claim.

Even if there was no contract, the statement that the chair of a hearing panel "is responsible for conducting a fair, orderly, and expeditious hearing" (Dkt. 17 at 24–25) is not a "clear and unambiguous promise" that would reasonably induce reliance. *Cyberchron Corp.*, 47 F.3d at 44; *see also Ezold v. Wellpoint, Inc.*, No. 3:06CV00381(AWT), 2007 WL 1238725, at *5 (D. Conn. Apr. 28, 2007) ("Statements in a job description or an anti-harassment policy are at the most statements of intention or an articulation of company goals and objectives, and cannot give rise to liability under a theory of promissory estoppel." (internal quotation marks omitted)). In other words, Plaintiff has not plausibly alleged that he reasonably relied on the promise of a "fair, orderly, and expeditious hearing" when he chose to attend HWS instead of another college and pay tuition. Accordingly, Plaintiff's promissory estoppel claim is dismissed.

## VI. Negligence

Plaintiff's fifth cause of action is for negligence. (Dkt. 14 at ¶¶ 91–96). HWS argues that Plaintiff's negligence claim "essentially duplicates his breach of con-

tract claim arising out of HWS' policies," and that New York law does not recognize a cause of action for negligence arising out of the manner in which a school handles a disciplinary proceeding. (Dkt. 15 at 31–32).

Plaintiff alleges that HWS, having established a student disciplinary process, "owed a duty of care to Rolph and others to conduct that process in a non-negligent manner and with due care." (Dkt. 14 at ¶ 92). He alleges two sources of that duty: (1) "the contractual and/or quasi-contractual relationship between the parties"; and (2) "the role of the Colleges in providing an education consistent with the liberal values of fairness and due process," which arises from the accreditation standards imposed on HWS by the Meddle States Commission on Higher Education. (*Id.* at ¶ 93(a), (b)). According to Plaintiff, the conduct of HWS in conducting an investigation and in holding a hearing fell below the applicable standard of care, causing him damages. (*Id.* at ¶¶ 94–96).

▮▮▮ "To succeed on a negligence claim, a plaintiff must establish a legal duty, a breach of that duty, proximate causation, and damages." *Prasad,* 2016 WL 3212079, at *23 (dismissing claim of negligence against university arising out of its investigation of allegations of sexual misconduct). "[C]ourts routinely dismiss tort claims where they are duplicative of a simultaneously pled breach of contract claim." *Id.* (citing *Guilbert v. Gardner,* 480 F.3d 140 (2d Cir. 2007)); *see also Faiaz,* 64 F.Supp.3d at 362 (dismissing negligence claim where the facts alleged in support of that claim were "similar to those alleged in connection with his contract claim-that the University breached its duty (contract) with plaintiff to follow its own rules regarding student discipline"). Further, "[t]here is no cause of action in the State of New York sounding in negligent prosecution or investigation." *Yu v. Vassar Coll.,* 97 F.Supp.3d 448, 484 (S.D.N.Y. 2015) (quoting *Coleman v. Corp. Loss Prevention Assocs.,* 282 A.D.2d 703, 724 N.Y.S.2d 321 (2d Dep't 2001)).

▮▮ To the extent that Plaintiff asserts that the duty giving rise to his negligence claim stems from the contract (Dkt. 14 at ¶ 93(a) ("This duty is imposed by the contractual and/or quasi-contractual relationship between the parties.")), the negligence claim fails. *Prasad,* 2016 WL 3212079, at *23; *Faiaz,* 64 F.Supp.3d at 362. Plaintiff's opposition papers focus on accreditation standards—as opposed to a contract—as the source of HWS's alleged duty. (Dkt. 17 at 25–26). In support of his position, Plaintiff argues that courts have recognized that accreditation standards create an independent duty of care for schools and other entities, citing a number of out-of-state cases. (Dkt. 17 at 26–27 (citing *United States ex rel. Diop v. Wayne Cty. Cmty. Coll. Dist.,* 242 F.Supp.2d 497, 524–25 (E.D. Mich. 2003); *Gess v. United States,* 952 F.Supp. 1529, 1552 (M.D. Ala. 1996); *A.W. v. Lancaster Cty. Sch. Dist. 0001,* 280 Neb. 205, 222, 784 N.W.2d 907 (2010); *Fletcher v. S. Peninsula Hosp.,* 71 P.3d 833, 837 (Alaska 2003)). However, none of these cases support Plaintiff's position; in other words, none stand for the proposition that, under New York law, accreditation standards give rise to a duty of care for colleges or universities. Indeed, Plaintiff concedes that "New York does not appear to have addressed the issue." (Dkt. 17 at 26). Having failed to demonstrate that New York law recognizes a duty of care arising out of accreditation standards, Plaintiff's negligence claim is dismissed.

## VII. Negligent Infliction of Emotional Distress

Plaintiff concedes that he has not stated a claim for negligent infliction of emotional

distress. (Dkt. 17 at 26). Accordingly, this claim is dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted in part and denied in part. (Dkt. 15). Specifically, Defendant's motion is denied with respect to Plaintiff's Title IX counts (Counts I and II) to the extent those causes of action allege an erroneous outcome claim, but it is otherwise granted and the remaining claims are dismissed.

SO ORDERED.